[No. 30203. Department Two. August 7, 1947.]

WARREN GREEN, *Respondent*, v. IVER FLOE, JR., *et al.,*
*Appellants.*[1]

[1]Reported in 183 P. (2d) 771.

*O'Leary & Meyer,* for appellants.

*Wright, Booth & Beresford* and *Philip W. Schoel,* for respondent.

JEFFERS, J.—This action was commenced by Oliver F. Green, as guardian of Warren Green, his minor son, against Roy White and wife, and Iver Floe, Jr., and wife, to recover damages for personal injuries claimed to have been sustained by Warren Green as the result of a collision between a 1934 Ford coupe, driven by George Forsell, and an International logging truck, owned by Iver Floe, Jr., and wife, and being operated at the time of the accident by their employee, Roy White. The basis of plaintiff's action was the alleged careless and negligent parking of the truck by Roy White upon the right half of the main traveled portion of highway No. 5, after dark, without any light or flare burning to disclose its presence upon the highway to traffic approaching from the rear of the truck.

Defendants, by their answer, denied the allegations of negligence and, as a first affirmative defense, alleged that any damage, loss, or injury to plaintiff was due to the con-

tributory negligence of plaintiff. As a second affirmative defense, it was alleged that, in the event the Ford coupe in which plaintiff was riding at the time of the collision was being driven by George Forsell, as alleged in the complaint, then Forsell, at such time and place, was driving the coupe at the instance of plaintiff and as plaintiff's agent; that Forsell was guilty of contributory negligence which was a proximate cause of the injuries and damages claimed by plaintiff, without which no damages or injuries would have been suffered by plaintiff.

Plaintiff by his reply denied the affirmative allegations of the answer not admitted by the complaint.

This cause, being No. 16972 of the superior court records of Lewis county, was apparently consolidated, for the purpose of trial, with cause No. 16966, wherein Iver Floe, Jr., doing business under the firm name and style of Floe's Garage, was plaintiff, and Lena and Oliver F. Green were defendants.

The consolidated causes came on for hearing before the court and jury on October 31, 1946. We shall not again refer to cause No. 16966, as no appeal was taken from the judgment entered in that case. The jury in cause No. 16972 returned a verdict in favor of plaintiff on November 1, 1946. On November 4th following, defendants Floe and wife and White and wife filed a motion for judgment notwithstanding the verdict and, in the alternative, for a new trial, which was denied on December 28, 1946. On the date last mentioned, the court entered judgment on the verdict in favor of Warren Green. Defendants have appealed from the judgment entered.

The assignments of error are in denying appellants' motion for nonsuit made at the close of respondent's case; in denying appellants' motion for judgment n. o. v. and, in the alternative, for a new trial; in entering judgment on the verdict; and in giving instructions Nos. 13, 14, 15, 16, 25, and 33.

Appellants in their brief have discussed together the claimed errors relative to the trial court's refusal to grant their motion for nonsuit and motion for judgment n. o. v.,

and the entry of judgment on the verdict. We shall so discuss them here.

■ We have so often stated the rule applicable to our consideration of a motion for nonsuit, a directed verdict, and a judgment n. o. v., that it needs no repetition here. We have also stated that, in the determination of such motions, even though the plaintiff's evidence is in some respects unfavorable to him, he is not bound by the unfavorable portion of such evidence, but is entitled to have his case submitted to the jury on the basis of the evidence which is most favorable to his contention. *Lindberg v. Steele*, 5 Wn. (2d) 54, 104 P. (2d) 940.

In the case at bar, the accident occurred on state highway No. 5, about a half mile west of Cosmos, in Lewis county, at which point the paved portion of the highway is twenty feet wide. This road has what is commonly called a blacktop surface. On either side of the highway is a ditch three or four feet deep and, between the outer edge of the pavement and the ditch, is a shoulder of about three feet. At the point of collision, the road runs in an easterly and westerly direction, and there are no grades or curves near the scene of the accident.

Appellant White was employed by appellant Floe in the operation of the truck, and no contention is made that White was not in the course of his employment at the time of the accident. Just before the collision, which occurred at about nine o'clock on the evening of November 2, 1940, White had stopped at the home of his father-in-law, in Cosmos, and cut the trailer loose from the truck, after which he proceeded west toward Chehalis, to the scene of the accident, where he stopped the truck, partly on the paved portion of the highway and partly on the shoulder. The witnesses who described the location of the truck did not all agree as to just how much of the truck was on the paved portion of the highway, but they all admitted that a part of the truck was on the highway. However, White stated the truck was approximately six feet wide, and, admitting that he parked the truck as near the edge of the ditch as possible, the jury were entitled to believe there was

at least three feet of the truck on the paved portion of the highway. The truck was fourteen feet eight inches long.

White stopped his truck at this point for the purpose of going to the home of a Mr. Swinth to get a piece of meat. He did not intend to stop long and left his wife and two children in the truck.

At the point of collision and where the truck was stopped, there was a bridge sixteen feet wide across the ditch hereinbefore referred to. This bridge was a part of the driveway leading into the Swinth home. Mr. White stated he parked the truck "at the bridge approach leading into their [Swinth's] house." White stated that there was a new taillight on the truck, and that it was attached and working; that all of his lights were working when he went into the Swinth house.

While the truck was parked as above described, George Forsell, driving a 1934 Ford coupe, owned by Warren Green's parents, who had consented to the boys taking the car, approached the scene of the accident from the east, or from the rear of the truck. Forsell and Green had stopped at Cosmos and had a glass of beer. Green decided he would go to Chehalis to see his sister, so the boys started west from Cosmos. Forsell was driving at about forty miles an hour, and estimated that he was proceeding about two feet from the right-hand edge of the pavement. He stated that he did not see the truck until he was right on it, not over ten or fifteen feet from it; that he saw no lights on the truck, and that it looked to him like the truck was right in his driving lane; that as soon as he saw the truck, he turned the wheel real sharp to the left but could not miss it. The right front of the car struck the back left duals of the truck. The witness stated that all the lights he saw were those of a car approaching from the west, which it developed was being driven by one Blake. Forsell stated that there was some fog, but that it did not bother him in driving.

Warren Green stated that, at the time of the accident, he was twenty years of age and living at home; that, as he and Forsell left Cosmos, proceeding west, he was observing the road; that he did not see any vehicle in the road ahead,

except the approaching Blake car, which Green stated they could not help but see as its lights were right in their faces. Green did not remember at what point he first saw the lights on the Blake car, but it was before they got to the truck. He stated that the lights on the Blake car were bright, and that the driver dimmed them three or four times until Forsell dimmed the lights on the Ford. Green stated that they were about ten feet from the truck when he first saw it; that it just suddenly loomed up ahead; that he just caught a glimpse of it; that he did not see any lights on the truck. He stated that he did not see much after they hit the truck. Green was seriously injured by the collision.

On cross-examination, Green stated that he was buying the car, but that it was in his parents' name, because he was under age. The witness stated that, as they proceeded west, they were on the right-hand side of the road.

"Q. And the lights were good lights, were they? A. Good, yes. Q. Were they lawful lights? A. Yes. Q. Lights that would throw ahead for a couple of hundred feet or so? A. That it is right. Q. If your lights were good lights, would throw a couple of hundred feet, why was it you did not see this truck, if it was standing there right in the middle of the road in your lane? A. When David Blake came to meet us he dimmed his lights three or four times until we dimmed ours. Isn't that the customary thing to do when you meet a car? Q. I am asking you the questions, Mr. Green. A. That is the reason. Q. You dimmed your lights, did you? A. Yes. Q. When your lights were dimmed how far ahead could you see an object in the highway? A. Oh, I would say not too far. Q. Were they lawful lights so they would shine ahead so you could see the distance the law requires you to see when they are dimmed? A. So far as I know, they were lawful lights, but in that model car there are not any lights that are good lights. Q. They were not really good lights? A. Passable. Q. You could see an object up in the road directly ahead of you how far before they were dimmed? . . . A. Well, I would be safe in saying forty feet. . . . Q. And when they were dimmed the lights would show how far ahead? A. Considerably less. Q. How much less? A. Maybe thirty feet."

Mr. Green was taken to the hospital immediately after the accident and did not see the truck again.

Henry Goodwin, who lives just west of where the accident happened, was called by respondent. Goodwin was at home the night of the accident and heard the crash. He ran to the scene of the collision, and when he arrived there was about two feet of the truck on the pavement. He stated that the truck was right in front of the driveway, that is, in front of the bridge hereinbefore referred to, which came clear out to the edge of the road.

Goodwin further stated that, after the accident, the truck was moved to his place across the road, where he had a mill; that the next morning, at about eight o'clock, he examined the truck and did not see any taillight, except a brand new one which was lying on the frame back of the hind wheels, but not bolted to the truck or hooked up; that he was present when they cleaned things up, and he saw no taillight, other than the one mentioned. When Goodwin reached the scene of the accident, the headlights on the truck were on dim. He stated that he helped get the truck out after the accident, and he saw no taillight. Goodwin further stated that the new taillight, hereinbefore referred to, must have been placed on the frame after it had been pulled into his place. He was then asked:

"Q. And you do not want to be understood as testifying that there was not any tail light on this car [truck] prior to this collision? A. Yes, I will testify that there was no taillight on it. Q. What makes you say that? A. Because I know that night I helped clear up the glass and things and there was no sign of any tail light having been on there."

Earl Clark, called by respondent, stated that he went to Chehalis with Warren Green's father about a week after the accident and, while there, heard a conversation between Mr. Green and appellant White, in the Floe Garage. During this conversation, Mr. Green asked White if he was sure his taillight was on, and White answered, "Well, I hope it was on; it was supposed to be." Mr. Clark's testimony continued:

"Q. Did he say anything more about the tail light? A. He would not say one way or the other. He just said, 'I hope it was on.'"

Iver Floe stated that, just prior to the accident, the truck had been in the shop and completely rebuilt; that the lights were made perfectly legal; that, when he reached the scene of the accident some fifteen minutes after the collision, the headlights were on, but that the taillight had been bent under the frame and what was left of the light was still attached to it. This witness stated that the truck was repaired in his shop after the accident. On further examination, Mr. Floe stated that he had no 1940 records; that he had no records prior to January 1, 1941. A subpoena had been served on him to produce certain books and records pertaining to the truck involved in the accident.

Mrs. Roy White, who was in the parked truck, did not know whether any portion of the truck was on the pavement or not. While she stated the lights were on, she did not remember whether the headlights were on or not—the lights she referred to were the parking lights. On cross-examination, Mrs. White stated that she did not get out of the truck to see whether the taillight was burning.

David Blake, called by appellants, was proceeding east on the highway. He stated it was "kind of cloudy, and there was fog along the road, but at that time there was no fog"; that the truck was well lighted with two headlights and two clearance lights; that, when he was about two hundred feet away from the truck, he could tell it was standing still; that he first noticed the Green car when it came around the Cosmos corner onto the highway; that the Cosmos curve is about one thousand feet east of the point of the accident. At the time of the accident, Mr. Blake was eighteen years old, and, since the accident, he has married a sister of Mrs. White.

Appellants first contend that the trial court should have decided as a matter of law that respondent, Warren Green, was guilty of contributory negligence, and that such negligence was a proximate cause of the injuries sustained by him.

Before discussing this contention, we desire to state that we are of the opinion there was sufficient evidence in

this case to take the question of appellants' negligence to the jury.

Rem. Rev. Stat., Vol. 7A, § 6360-110 [P.P.C. § 295-71], provides in part as follows:

"It shall be unlawful for any person to stop, park or leave standing any vehicle, whether attended or unattended, upon the paved, improved or main traveled portion of any public highway outside incorporated cities and towns *when it is possible* to stop, park, or so leave such vehicle *off such paved, improved or main traveled portion of such public highway.* . . . *Provided,* This section shall not apply to the operator of any vehicle which is disabled upon the paved or improved or main traveled portion of any public highway in such a manner and to such an extent that it is impossible to avoid stopping and temporarily leaving such vehicle in such position." [Italics ours.]

There is no contention that the truck involved in this action was disabled. The evidence conclusively shows that the truck was parked partly on the paved part of the highway, and that, at the point where the truck was parked, there was a bridge and driveway which would have permitted White to drive the truck completely off the highway. There was testimony from which the jury could have concluded there was no taillight burning on the truck at or during the time it was parked. Appellant White stated that he parked the truck as far off the highway as he could, but we are satisfied that, under the conditions here shown to exist, White did not comply with the plain language of the section above referred to; that, having failed to comply with the statute, he was guilty of negligence.

Returning now to the alleged contributory negligence of respondent, we stated in *Hadley v. Simpson,* 9 Wn. (2d) 541, 115 P. (2d) 675:

"Contributory negligence is an affirmative defense, the burden of proving which is upon the defendant. Except in rare cases, it is a question of fact to be determined by the trier of the facts. *McQuillan v. Seattle,* 10 Wash. 464, 38 Pac. 1119, 45 Am. St. 799. Only when it may be said that the minds of reasonable men cannot differ on the question of the negligence of the injured person, is the court warranted in decided the issue as a matter of law. *Nystuen v.*

*Spokane County,* 194 Wash. 312, 77 P. (2d) 1002.

"All travelers on the highways are justified in assuming that other travelers will observe the rules of the road, and may act upon that assumption without being guilty of contributory negligence. *Richmond v. Tacoma R. & Power Co.,* 67 Wash. 444, 122 Pac. 351; *Stubbs v. Molberget,* 108 Wash. 89, 182 Pac. 936, 6 A. L. R. 318. The questions of contributory negligence and negligence are so interrelated that the former usually cannot be determined without reference to the latter. *Richmond v. Tacoma R. & Power Co., supra; Hines v. Chicago M. & St. P. R. Co.,* 105 Wash. 178, 177 Pac. 795. It is for this reason that this court has frequently said that, in negligence cases, the facts make the law. By the same token, decided cases afford little help in determining the issue."

In *Briggs v. United Fruit & Produce,* 11 Wn. (2d) 466, 473, 119 P. (2d) 687, we quoted from the case of *Beckstein v. Sayler,* 93 Ind. App. 686, 179 N. E. 581, as follows:

" 'Before such negligence will defeat a recovery it must be shown to be the proximate cause of the injury complained of or that it proximately contributed thereto.' "

Appellants strongly contend that the testimony of respondent relative to the lights on the Ford car conclusively establishes contributory negligence. They argue that, because respondent testified that, under the conditions here shown to exist, the lights on the Ford car would disclose an object on the highway only about forty feet ahead when on bright, and thirty feet when on dim, the driver of respondent's car was guilty of contributory negligence in operating it at a speed of forty miles an hour. Appellants cite Rem. Rev. Stat., Vol. 7A, § 6360-25 [P.P.C. § 291-23], which provides in part:

"All head lamps shall be of such nature, and contain such intensity and distribution of light to reveal persons, vehicles and objects within a reasonable distance ahead under all conditions of loading, all factors considered. . . ."

They next refer to Rem. Rev. Stat., Vol. 7A, § 6360-26 [P.P.C. § 291-25], which provides how the head lamps shall be arranged and regulates the elevation of the projected beam.

Appellants admit that neither of the cited sections state just how far ahead of an automobile the headlights should disclose persons, vehicles, and objects, but state that it is apparent that respondent's car was not equipped with lights such as the statute requires.

Appellants then refer to and quote from Rem. Rev. Stat., Vol. 7A, § 6360-27 [P.P.C. § 291-27], as follows:

"When necessary by reason of emergency, any motor vehicle may be operated during hours of darkness when equipped with two lighted lamps on the front thereof capable of revealing persons and objects seventy-five (75) feet ahead in lieu of other head lamps required by this act: *Provided,* That at no time shall it be operated at a speed in. excess of twenty (20) miles per hour. . . ."

Appellants then state:

"Respondent was not operating his automobile under any conditions of emergency. To appellant it seems to necessarily follow that if an automobile can be driven on the highway in an emergency as defined by statute during hours of darkness only when equipped with two lighted lamps on the front 'capable of revealing persons and objects seventy-five (75) feet ahead,' and then at a speed not exceeding twenty miles per hour, that respondent as a matter of law was guilty of contributory negligence in driving his car at forty miles an hour when his lights were only capable of revealing persons and objects forty feet ahead when his lights were on high and thirty feet ahead when his lights were dimmed."

■ This case was tried some six years after the accident occurred. Respondent's testimony as to distances was only an estimate. It will also be remembered that, in answer to questions propounded by counsel for appellants, this witness stated the lights were legal lights—lawful lights. These things the jury had the right to consider. They also might have believed that respondent's testimony relative to the distances of forty and thirty feet was given having in mind that the lights from the Blake car shone in the faces of both respondent and the driver of the car. They also had the right to consider that here was a truck, standing partly on the highway, without any taillight to warn

approaching traffic. All of these things the jury were entitled to consider in determining whether or not the Ford car was being operated in a reasonable and prudent manner, under all the conditions then existing.

In the case of *Morehouse v. Everett,* 141 Wash. 399, 252 Pac. 157, 58 A. L. R. 1482, we refused to follow what has been referred to as the "drive within the radius of your lights rule." In the cited case, Dr. Morehouse, of Everett, drove his car into a building which was being moved and had been left on the street by the movers. The accident occurred about three or four o'clock in the morning while the doctor was answering a call. He had seen the building on the street earlier in the evening and detoured.

While we appreciate that appellants do not here specifically contend for the "drive within the radius of your lights rule," it seems to us the effect of their contention is the same.

We think the following statement in the cited case is particularly applicable in cases where the driver of an automobile runs into a stationary object on the highway:

"The rule contended for is, in our opinion, entirely too broad, and, if put in effect, would have very serious and unjust results. It loses sight of the fact that one driving at night has at least some right to assume that the road ahead of him is safe for travel, unless dangers therein are indicated by the presence of red lights; it does not take into consideration the fact that visibility is different in different atmospheres and that at one time an object may appear to be one hundred feet away, while at another time it will seem to be but half that distance; it fails to consider the honest error of judgment common to all men, particularly in judging distances at night; it loses sight of the fact that the law imposes the duty on all autos traveling at night to carry a red rear light and the duty on all persons who place obstructions on the road to give warning by red lights or otherwise; it fails to take into consideration the glaring headlights of others and the density of the traffic, and other like things which may require the instant attention of the driver; it does not take into consideration that a driver at night is looking for a red light to warn him of danger and not for a dark and unlighted auto or other obstruction in the road. We believe that, generally speaking,

where the statutes or the decisions of the courts require red lights as a warning of danger on any object in the highway and such lights are not present, it is a question for the jury to determine whether the driver at night should have seen the obstruction, notwithstanding the absence of red lights."

In the case of *Schouten v. Jacobs,* 26 Wn. (2d) 798, 175 P. (2d) 627, we stated:

"It seems to us the above statements of appellant and the cases cited demonstrate that there is no established test by which it can always be determined whether or not the driver of an automobile on a public highway who collides with a stationary object is guilty of contributory negligence as a matter of law."

See *Frowd v. Marchbank,* 154 Wash. 634, 283 Pac. 467, which involved a collision with cows on the highway.

We are of the opinion that, in the instant case, the trial court did not err in submitting to the jury the question of the negligence of appellants and the contributory negligence of respondent.

The jury by its verdict must have concluded that respondent was not guilty of contributory negligence which was a proximate cause of the injuries received by him, but that such injuries were caused by appellants' negligence.

In view of what we have stated, the judgment of the trial court must be affirmed, unless the trial court committed error in giving one or more of the instructions complained of.

 Objection is first made to instructions Nos. 13 and 14.

"(13) You are instructed that all travelers on the highways are justified in assuming that other travelers will observe the rules of the road, and may act upon that assumption without being guilty of contributory negligence."

"(14) You are instructed that a person operating a vehicle upon public highways may, in the exercise of reasonable care, presume that other users of the highway will obey the law."

Appellants' objection to the above instructions, as stated in their brief, is as follows:

"Travelers, it is true, have the right to assume that other users of the road will observe the rules of the road but may only act upon that assumption without being guilty of contributory negligence *until they have notice to the contrary or until such time as by the reasonable exercise of their faculties they should have had notice to the contrary.*" (Italics ours.)

In other words, it is appellants' contention the above instructions did not go far enough and should have contained the additional statement above italicized. It may be stated that appellants cite no authority to sustain their contentions relative to any of the instructions objected to.

While the question was not raised by way of an objection to an instruction, we expressly sanction the law as stated in the above instructions, in *Hadley v. Simpson, supra,* where we stated:

"All travelers on the highways are justified in assuming that other travelers will observe the rules of the road, and may act upon that assumption without being guilty of contributory negligence."

Appellants next object to instruction No. 15, for the reason that it implies that the driver of respondent's car had the right to assume that the road was safe for travel unless the dangers were indicated by red lights, and that the absence of warning by red lights amounted to an implied invitation to travel the road in the usual manner. Appellants argue that

". . . such surely cannot be the law, for the statutes heretofore quoted plainly require that respondent's automobile be equipped with headlights sufficient to disclose 'persons, vehicles and objects' at a reasonable distance ahead. In no event should a driver expect a person or an object to be indicated by red lights. By this instruction the court erroneously informed the jury that the driver of respondent's car was obliged to see nothing ahead not indicated by red lights."

We are inclined to believe that the instruction does not bear the interpretation placed upon it by appellants, and that they have presented an exaggerated view of the effect

of the instruction. We again call attention to the case of *Morehouse v. Everett, supra,* wherein we stated:

"One driving at night has at least some right to assume that the road ahead of him is safe for travel, unless dangers therein are indicated by the presence of red lights,"

and to the case of *Hadley v. Simpson, supra,* wherein we stated:

"All travelers on the highways are justified in assuming that other travelers will observe the rules of the road, and may act upon that assumption without being guilty of contributory negligence."

■ All of the instructions must be considered together, and the jury in this case were so instructed.

■ If instructions Nos. 13, 14, and 15 were deficient, then, in our opinion, any such deficiencies were cured when read in connection with instructions Nos. 18, 19, and 20. We quote instructions 18 and 19 only:

"(18) You are instructed that one may not cast the burden of his own protection upon another. He owes a duty to himself. The law does not permit him to close his eyes to danger and then if he is injured as a result of such danger to seek a remedy in damages against another, or be excused from the consequences of his own acts. He must use his own intelligence and faculties for his own protection. If you find from a fair preponderance of the evidence that the plaintiffs, or either of them, failed to so exercise his faculties and intelligence and that such failure on his part contributed to the injuries suffered by him, if any, then your verdict must be for the defendant so far as that plaintiff is concerned."

"(19) In determining the negligence, if any, of the operators of the automobiles of Mr. Green and Mr. Floe, you must take into consideration all the facts and circumstances surrounding the accident including the speed of the car, the condition of the weather, the width of the highway, the width of the shoulders on the highway, if any, the ability of the driver of either car to avoid a collision in the exercise of ordinary care and any other facts or circumstances properly before you in evidence."

Objection is next made to instruction No. 25. We are of the opinion this instruction properly states the law applicable to the facts in the case.

■ Appellants' next objection is to instruction No. 33, wherein the court informed the jury what they might consider relative to the mental and physical pain suffered by respondent on account of the injury to his leg. Appellants particularly object to the following language of the instruction:

"In arriving at a verdict, it is the duty of the jury to consider whether or not Warren Green suffered *mental* and physical pain on account of the injury to his leg, and whether or not he was rendered a *cripple* for life." (Italics ours.)

While we think the use of the phrase "cripple for life" was not the best choice of words, we are of the opinion no reversible error was committed by their use, in view of the testimony in the case. The testimony shows that Green has a permanent disability to his knee. The knee was broken in eight places. The leg bothers him continually, and especially in damp weather. It squeaks. As the result of a demonstration in the courtroom, in answer to a request from counsel for appellants, the squeak in respondent's knee was audible to the jurors. There was medical testimony to the effect that the knee would probably get worse. Green stated he has rheumatism and cramps—that the pain is like a toothache, a bad one; that no liniment will help it. It is bad when he goes down hill, and sometimes the leg will trip him; that, after it is bent, the strength is gone. Green is a mechanic, and the knee is so tender that it is difficult to kneel. After the accident, Green was in the hospital twenty-nine days and was unable to work for about ten months.

The testimony of Dr. Asmundson was to the effect that the kneecap was completely fractured, there were several fractures; that as a result Green has an unstable knee. The doctor found it necessary to make an incision along the kneecap, drill holes in the bone and, by means of steel wires, bring the broken bones together. The wires were still in,

at the time of the trial, and the kneecap was considerably larger than the other one. It was broader, thicker, and rougher, because of the fact that it was all smashed up, and, in the process of healing, the extra callous made a large deformed kneecap. The doctor further testified that at the time of the trial, six years after the accident, there was a complication not uncommon in a comminuted fracture of the patella. When asked what the complication was, the doctor answered:

"A. The fact that the knee is sensitive and that he has arthritis in the knee joint. Q. What is the cause of the arthritic condition? A. The injury to the joint surface, to the under side of the kneecap, and also of the joint itself . . . Q. With regard to permanency, is that arthritis apt to clear up? A. No. Q. The injury which he now has is an injury with which he will go through life? A. Yes."

It was alleged in the complaint that, as a result of the injuries received, Green suffered a severe nervous and mental shock and much pain and anguish, and that, for a long time to come, he will continue to suffer physically and mentally.

In view of the above allegations and the testimony in this case, did the court err in instructing the jury they might consider whether Green suffered *mental* and physical pain on account of the injury to his leg?

"The general rule is that in an action for a physical injury the recoverable damages may include compensation for mental anguish or suffering which results so directly from that injury as to be the natural, legitimate, and proximate consequence thereof." 15 Am. Jur. 592, § 175.

"A reason given for the rule is that the mind is a part of the body, and an injury to the body includes the whole, and its effects are not separable. In such cases the mental suffering is merely an aggravation of damages when it naturally ensues from the act complained of." 15 Am. Jur. 593-4, § 176.

"Mental suffering, when connected with any bodily injury, is always to be considered in damages." 4 Shearman & Redfield on Negligence (Rev. ed.) 1947, § 856.

" 'Physical pain' and 'mental suffering' are bracketed together as elements of damage in personal injury cases. The

former is the immediate felt effect upon the nerves and brain of some lesion or injury to a part of the body. The latter is distress which is not felt as being directly connected with any bodily condition. Mental suffering is regarded by the courts as a usual accompaniment of physical pain, and the difficulty of distinguishing the two has been deemed a reason for allowing damages for mental suffering. A claim for bodily pain lets in mental suffering." McCormick on Damages, p. 315, § 88.

"Mental pain and suffering in connection with a wrong which apart from such pain and suffering constitutes a cause of action is a proper element of damages where it is the natural and proximate consequence of the wrong." 25 C. J. S. 549, § 63.

We are of the opinion the court did not err in giving instruction No. 33.

Finding no reversible error in the instructions complained of, we are of the opinion the trial court properly denied the motion for new trial.

For the reasons herein assigned, the judgment of the trial court entered on the verdict is affirmed.

MALLERY, C. J., STEINERT, ROBINSON, and HILL, JJ., concur.