[No. 33425.   Department Two.   May 31, 1956.]

MAMIE DAHLGREN, *as Executrix, Appellant,* v. CARL A. BLOMEEN, *Respondent.*
CARL A. BLOMEEN, *Respondent,* v. MAMIE DAHLGREN, *Appellant.*[1]

[1]Reported in 298 P. (2d) 479.

*Elliott, Lee, Carney & Thomas,* for appellant.

*Walthew, Oseran & Warner,* for respondent.

ROSELLINI, J.—This is an appeal from a decree in favor of the respondent, Carl Blomeen, impressing a lien upon the net estate of Ellen S. Ross, deceased. The appellant, Mamie Dahlgren, is executrix and residuary legatee under the will of Ellen S. Ross.

The lien imposed by the trial court was based upon two findings: first, that the parties had entered into an oral agreement to make and maintain mutual wills; and second, that the decedent had executed a written agreement to make and keep in effect a will leaving her net estate to the respondent in consideration of his conveying to her the lot on which the home of the parties was situated. The appellant has assigned error to these findings.

In about the year 1932, the decedent began to live with the respondent in a meretricious relationship, which continued until May, 1953, when she moved into the home of the appellant, who had offered to care for her during her illness. She died of cancer on October 9, 1953.

Throughout the years that the parties lived together, the decedent was employed as a billing clerk for a steel manufacturer. The respondent was employed at a machine shop until his retirement in 1944, after which he continued to operate a small machine shop, which he termed a "hobby shop," in the basement of their home. It appears that the earnings of the decedent were substantially larger than those of the respondent; however, they pooled their resources and paid their living expenses out of a common fund.

On November 11, 1939, the respondent purchased a lot in Seattle, on which the parties caused a house to be constructed, using their common funds. They made their home in this house until the decedent moved away in 1953. The respondent has continued to reside in the home.

In 1942, the respondent deeded the lot to the decedent;

and, at the same time, reciprocal wills were executed. Contemporaneously with the execution of the deed and wills, an agreement was drawn by Storey Birdseye, a Seattle attorney, whereby the decedent, in consideration of the conveyance to her of the lot, agreed to bequeath and devise all of her property to the respondent. The original of this agreement was not produced at the trial; and the carbon copy introduced in evidence was not signed or dated. Mr. Birdseye testified that, based upon the condition of his files, he was reasonably certain that the agreement had been signed by the decedent.

In 1947, in order to facilitate a suit which the respondent had brought against the owners of an adjoining lot for removal of lateral support, the decedent deeded the property back to him. At the same time the respondent executed a deed dated three months in advance and delivered it to the decedent.

Wills were executed by both parties in 1944 and in 1947, the only changes being in contingent beneficiaries. On November 3, 1952, the decedent executed a new will, whereby she left to Blomeen and two other beneficiaries one dollar each, and to the appellant the balance of her estate. At the time of her death in 1953, the respondent's will was still in effect.

The parties had lived together happily until Ellen Ross' health began to fail two years before her death, when she became increasingly critical of the respondent. The evidence was conflicting as to whether he mistreated her during this period, but the trial court believed the testimony of witnesses who said he was always kind to her. The decedent moved into the home of the appellant; however, the respondent refused to allow her to take furnishings and personal belongings from the home until he was advised by his attorney that she had a right to do so. Afterwards, she instituted a replevin action to obtain certain furnishings and other personal property located in the dwelling. Joined with this action was a forcible entry and detainer action. After the death of Ellen Ross, the appellant, as executrix, was substituted as plaintiff in these actions.

On February 2, 1954, the respondent instituted an action to impress a trust in his favor upon the estate, based upon an alleged breach of a contract to marry and an agreement to make mutual wills. In his complaint, the unilateral agreement of the decedent to leave her estate to the respondent in consideration of his execution of the deed, was not mentioned; however, it was set forth in his cross-complaint in the replevin and forcible entry and detainer action, wherein he prayed that the deed be canceled and he be adjudged the sole owner of both the realty and personal property located thereon. He also asked for judgment against the decedent in the amount of $4,192.09, being his personal funds which he claimed she had appropriated.

The two actions were consolidated and tried together to the court. As stated above, the trial court made findings that an agreement to make mutual wills had been entered into, and that, in consideration of the execution of the deed to the property, the decedent had agreed to devise all of her estate to the respondent. There was a finding that the articles of personalty had been acquired through the common fund, through inheritance by the decedent, by gifts made to the parties separately and jointly, and by purchase with their separate funds. The court found that certain items of furniture and other personalty within the dwelling were owned by the decedent and certain others were owned by the respondent.

If the court's finding in regard to either agreement is supported by the evidence, the judgment must be sustained. We find in the record no evidence of any agreement to make and maintain mutual wills, other than the fact that reciprocal wills were executed on three different occasions, and, as we held in *In re Edwall's Estate*, 75 Wash. 391, 134 Pac. 1041, reciprocal wills, although executed simultaneously, do not in themselves constitute evidence of a contract to execute such wills and keep them in effect. The wills executed by the respondent and the decedent contain no reference to an agreement to make and maintain such wills, and consequently they fall within the rule stated in *In re Edwall's Estate, supra*. Since there was no evidence to sus-

tain the court's finding that the parties had made such an agreement, the judgment can be sustained only if the court was justified in finding that the decedent had agreed to make and maintain a will in favor of the respondent, in consideration of his having deeded the home property to her.

The respondent, in his testimony, insisted that the agreement taken from the files of the attorney, Mr. Birdseye, was not the agreement which the decedent had signed, although he was equally certain that she had signed an agreement drawn in Mr. Birdseye's office on the same day that the wills and deed were drawn. The respondent at the trial described the agreement in these words:

"It say, she signed the paper, Mr. Birdseye made up the paper, she signed it, I have a right to stay in the house so long I live, or she could sell it or she could rent it or she could give it away, when she die everything go to me."

The copy produced from Mr. Birdseye's files was apparently the only copy of an agreement which he was able to find in connection with this matter, and he did not recall having drawn more than one agreement. The respondent testified that the original of the agreement which was signed had disappeared from a steel box in which he kept it.

In appraising the testimony of the respondent, the trial court said:

"Mr. Blomeen's testimony I find has got to be taken with some caution . . . I feel that he is essentially an honest person, I think he is kindly, I think he is a person who is not subject to influence or suggestion in what he testified to be the facts or his understanding of the facts. I think regardless of what anybody said to him he would adhere to his views of what the facts are. On the other hand, I think he is handicapped very definitely by the lack of education, and possibly to some extent by,—well, let's say, a type of mentality that is not uncommonly found among people in this respect, that he may rely upon a document but he is not the type of person that will study the document and learn what it says, or if he reads it over will particularly know precisely what the document says. He gets a notion of what it is and he hangs onto his notion. The document may be a physical evidence that satisfies him that he has rights, we'll say, that are evidenced by that document, but so far as resorting to the docu-

ment itself to determine what those rights are, it would never occur to him. . . . I have seen quite a number of people that are that way. There are some people, you know, who will maintain in all seriousness that a given document gives them certain rights or that it says certain things. You read the document, it doesn't say that at all, or does not evidence those rights. Well, a person who functions that way mentally is one who relies on matters that he gets through his sense of hearing, through his conversation with someone. And he forms his impression, no matter how many times he may read over the thing, it doesn't mean anything to him in the slightest degree different from what he has heard.

. . .

"I haven't the slightest doubt in the world that the agreement . . . that Mrs. Ross (decedent) signed, was the agreement that Storey Birdseye drew in November of 1942.

. . .

"Now, as far as the language of the agreement is concerned, I think he has got that thing slightly distorted. . . . I don't think it is particularly inconsistent; an agreement which literally said what Mr. Blomeen now claims it said, of course, would be substantially different in the mind of the average lawyer from the agreement which is in evidence as Exhibit 13, but from a practical standpoint, looking at it through a layman's eyes, and particularly this very layman, Mr. Carl Blomeen, what difference does it make? He gets to stay there as long as he lives, and that's it, and it doesn't make any difference whether he's got the fee title or merely a life estate, he gets to stay there."

The appellant points to the rule that to establish a lost instrument, the evidence must be clear and positive, and of such a character as to leave no reasonable doubt as to the terms and conditions of the instrument, citing *Johnson v. Wheeler*, 41 Wn. (2d) 246, 248 P. (2d) 558; *Smyser v. Smyser*, 19 Wn. (2d) 42, 140 P. (2d) 959; *Scurry v. Seattle*, 56 Wash. 1, 104 Pac. 1129; *Kelliher v. Clark*, 120 Wash. 175, 206 Pac. 924; *Margett v. Wilson,* 85 Wash. 98, 147 Pac. 628; and *Neill v. Griner*, 85 Wash. 329, 147 Pac. 1137. Those cases were mainly concerned with the contents of the lost instrument in question, and in none of them was a copy of the instrument produced in court. The only question here was whether the agreement was ever signed.

■ This is not a case where a party has testified to facts not open to observation and peculiarly within his own knowledge, which facts if true would defeat his cause of action or his defense. The cases holding that a party is precluded by such testimony are reviewed at length in *Alamo v. Del Rosario*, 98 F. (2d) 328 (D. C. App.), and in an annotation in 169 A. L. R. 798. As the court said in *Alamo v. Del Rosario*, quoting from *Hill v. West End Street R. Co.*, 158 Mass. 458, 459, 460, 33 N. E. 582,

" . . . there is no sound reason why the familiar doctrine that a party may contradict, though not impeach, his own witness, should not, if the circumstances are consistent with honesty and good faith, be applied when he is himself the witness. . . . In other words, the law recognizes the fact that parties, as well as other witnesses, may honestly mistake the truth, and requires juries to find the facts by weighing all the testimony, whatever may be its source."

In *Green v. Floe*, 28 Wn. (2d) 620, 183 P. (2d) 771, we held that, even though some portions of his evidence are unfavorable to his case, a plaintiff is not bound by such evidence but is entitled to have his case submitted to the jury.

■ The respondent did not deny the execution of an agreement by the decedent, but maintained that the instrument signed contained other terms in addition to those contained in the written copy. The trial court, finding the testimony of the attorney who drew the instrument more credible in the light of the surrounding circumstances and considering the background and intelligence of the respondent, concluded that the respondent was mistaken, though honest in his intention. The court was convinced that the instrument had been signed, and we cannot say as a matter of law that the evidence was unconvincing.

■ The appellant contends that the court should not aid the respondent, relying on the rule that where parties have lived together in a meretricious relationship, in the absence of some trust relationship, the court presumes that their property has been placed where they want it to stand. *Creasman v. Boyle*, 31 Wn. (2d) 345, 196 P. (2d) 835. This presumption is rebuttable. *Poole v. Schrichte*, 39 Wn. (2d)

558, 236 P. (2d) 1044. In *Creasman v. Boyle, supra,* the plaintiff was attempting to show by parol evidence that he had a "community" interest in the property standing in the name of the decedent. Here, the respondent does not seriously contest the decedent's ownership of the property but relies upon a written agreement to bequeath her property to him. For this reason, the principles applied in *Creasman v. Boyle,* have no application here.

The respondent having proven by competent evidence, to the satisfaction of the court, that the decedent, for a valid consideration, had promised to devise and bequeath her property to him, the court properly imposed a trust upon the estate for his benefit. *McCullough v. McCullough,* 153 Wash. 625, 280 Pac. 70.

The judgment is affirmed.

HAMLEY, C. J., MALLERY, HILL, and WEAVER, JJ., concur.

---

July 30, 1956. Petition for rehearing denied.