Frank GALE, Appellant (Plaintiff below),

v.

Dale R. KAY, Dwaine Hilliard, C. A. Thomas, and LeBar Motors, Appellees (Defendants below),

and

Universal Underwriters, (Intervenor below).

No. 3184.

Supreme Court of Wyoming.

March 25, 1964.

Henderson, Godfrey & Kline, David D. Uchner, Cheyenne, for appellant.

Houston G. Williams, Casper, for appellees.

Before PARKER, C. J., and HARNSBERGER, GRAY and McINTYRE, JJ.

Mr. Justice McINTYRE delivered the opinion of the court.

Frank Gale as plaintiff brought suit against the driver and owners of a wrecker truck for damages resulting from an accident on icy roads, which occurred about 2 p. m., April 16, 1960, west of Douglas, Wyoming. Gale's wife was killed in the

accident; he himself received personal injuries; and his automobile was badly damaged.

A jury awarded damages to the plaintiff in the amount of $27,500. The award was against Dwaine Hilliard who drove the wrecker; and LeBar Motor Company and C. A. Thomas as employers of Hilliard and owners of the wrecker. The trial court gave judgment in favor of these defendants notwithstanding the verdict, and the plaintiff has appealed.

In addition to the driver and owners of the wrecker, Gale also brought his action against Dale R. Kay, the driver of a semi-trailer truck which was wrecked at the scene of Gale's accident. Gale alleged a collision with the semitrailer and also a collision with the wrecker. However, in connection with the claim against defendant-Kay, the jury found in favor of Kay and against plaintiff-Gale.

Although Kay's name was included in the appeal, no effort has been made to reverse the judgment in his favor. We therefore confine our considerations to the question as to whether there was sufficient evidence of negligence on the part of Hilliard to support the jury's verdict against him and against his employers who owned the wrecker truck.

██ Of course, we would not pretend to say whether the jury resolved the matter of Hilliard's negligence correctly; but we do think there was sufficient evidence from which it could reasonably infer negligence, which would mean the issue became a jury question.

An important factor in our determination is the testimony regarding weather conditions. Kay, driver of the semitrailer truck, described the visibility as "almost zero," when he came upon the scene. Hilliard himself said it was snowing and blowing snow and the roads were very bad and icy. He also said the visibility was bad.

Andrew C. Ayres, driver of a pickup and a rancher who had lived in the vicinity of the accident during all of his lifetime of 76 years, said the roads were the iciest he had ever seen; that the wind was blowing and it was snowing; and there was a ground blizzard and visibility was about 50 feet.

One of the highway patrolmen who investigated the accident testified that the highway was solid ice; that the wind was blowing hard and in his opinion nobody should be passing because of the wind and icy conditions. He described the visibility as being zero at times and said the maximum that could be seen ahead was 50, 60 or 70 feet, depending upon the wind velocity at the time. Another patrolman further verified that road conditions were very bad, being very icy and slippery.

Francis W. Curtin, who lives at Douglas, was at the scene of the accident. He testified that weather conditions were bad and the road was icy and the wind was blowing. At times, he said, visibility was zero and at times about 50 feet, as the wind was blowing snow. Also the defendant C. A. Thomas described similar road conditions.

### Failure To Place Flares

Hilliard traveled to the west and passed by a distressed Buick automobile which was in the south barrow pit and which he was to pull back onto the highway. He turned around at a side road 200 feet beyond. Despite road conditions and a lack of visibility such as the witnesses described, he did not stop at that point to set up flares.

If he intended to place flares on the highway, for the purpose of warning east-bound travelers from the west, whose lane of traffic he would be using, it would seem from all descriptions of the accident area that this would have been a good place to leave his wrecker and set up the flares.

In any event, the jury could have concluded existing weather conditions were such that an ordinarily careful and prudent driver would have stopped off the traveled portion of the highway and placed flares before attempting to maneuver his wrecker into a position, in a lane of traffic, for pulling a car out of the barrow pit.

Hilliard himself freely admitted the use of flares were indicated under the circumstances present. He testified that he had not put out flares or flashing signals because "I hadn't had time; I hadn't had my vehicle stationed yet." He also said he "was going to put out flares as soon as I got pulled back up into position."

Obviously, it was well within the province of the jury to believe that a person of ordinary care would have placed the flares and then pulled into position, instead of first maneuvering his vehicle and stationing it in a lane of traffic and then undertaking to place flares.

The need for care in warning oncoming traffic is indicated by the fact that something caused the Buick automobile to go into the ditch; afterwards the collision between the wrecker and Gale's automobile occurred; the semitrailer was wrecked before it could be stopped; and Ayres' pickup was also ditched and wrecked with the semitrailer on top of it.

### Movements on Highway

Hilliard admits his wrecker was struck from the rear by Gale's vehicle while he was attempting to get the wrecker in a position, on the highway, for pulling the distressed Buick out of the ditch. On the whole, the testimony of Hilliard was somewhat confused, insofar as his movements on the highway were concerned and with respect to the manner in which he intended to pull the Buick back onto the highway.

The following facts can be concluded from his testimony and from other undisputed evidence in the case, however:

1. The roadway itself was a two-lane highway, 24 feet wide. For approximately five minutes before being struck the wrecker was on the highway in the vicinity of the Buick, with all four wheels on the pavement. The Buick was sitting with its rear end to the north and toward the highway.

2. Hilliard drove up to where the Buick was and then backed 20 or 30 feet. This was done he said, "So I could get to the angle to pull him out." He was going to get in a better position to "latch on" to the distressed vehicle. Although he was up even with the Buick before backing, he testified that in his opinion he had to back and come up even again to get in the position he desired. After backing, Hilliard said he stopped and started pulling "over here" to get in position to pull out the car.

With the Buick sitting as it was, perpendicular to the highway, the jury was warranted in assuming the "position" referred to so many times by Hilliard as a position to pull out the car had to be a position somewhat across the highway. We have no way of knowing where the "over here" was, toward which he started pulling after his backing, but we can assume it satisfied the jury and had a part in the jury's determination.

Counsel for plaintiff asked the witness to mark his position on a plat, but counsel for defendant-Hilliard interposed an objection. The court sustained it. We hardly think counsel who made the objection can now expect us to resolve the doubt, as to the position indicated by Hilliard, in Hilliard's favor. In any event, Hilliard made it quite clear without any contradiction that all of his maneuvers were on the pavement and main-traveled part of the highway.

Moreover, there is no contradiction of the fact that the wrecker was struck on the left-rear corner. According to Hilliard, this caused the wrecker to be turned or spun almost all the way around. It ended up across the highway and in the center, which means it was far enough on the highway, when struck, so that it made such a turn without going into the barrow pit.

With respect to the backing done by Hilliard, he claims to have backed 20 or 30 feet, after which he had started forward again. Apparently he had only started forward again, at two to four miles per hour or "just barely creeping," when struck by Gale. This testimony was such that it may have left an impression with the jury to the effect that Hilliard's backing got him into a dangerous position, from which he had not yet recovered when struck.

In making our review of the evidence pertaining to Hilliard's movements on the highway, we have not intentionally omitted testimony more favorable to defendants. However, such testimony, if any, need not be considered inasmuch as the question before us is whether there was substantial evidence to support the jury's verdict. Additionally, the jury was entitled to reject such portions of Hilliard's testimony as it thought had been colored to excuse his conduct. Merback v. Blanchard, 56 Wyo. 152, 105 P.2d 272, 274, rehearing denied 56 Wyo. 286, 109 P.2d 49.

### Testimony of Plaintiff

The plaintiff himself testified as to events leading up to his accident, saying that his vehicle collided with the semitrailer driven by Kay and not with the wrecker driven by Hilliard. However, his complaint alleged a collision with the semitrailer and also a collision with the wrecker. Negligence on the part of Kay and negligence on the part of Hilliard were alleged. The court instructed the jury as to issues in accordance with the allegations and not on the basis of plaintiff's testimony.

It is clear and uncontradicted from the evidence that the collision impact was severe—in fact so severe that Gale's wife was killed immediately and Gale himself, according to medical testimony, was rendered unconscious with a brain concussion. He said the next thing he remembered he was in the hospital at Cheyenne. This must have been at a considerably later time, because he was first taken to the hospital in Douglas and afterwards moved to Cheyenne.

And yet, one of the highway patrolmen said he was walking around when the patrolman arrived. At that time the semitrailer was on top of Ayres' pickup vehicle. Pictures taken by the patrolman so show, and other witnesses so testified.

Gale's version of the accident was that he was about to pass the semitrailer; that its brake lights came on and then it started to swing over and came "right over on the top of my car." He testified he saw no other vehicle. His version of the accident is contradicted by all of the other witnesses and by physical facts in the case, such as paint from his car being on the wrecker and not on the semitrailer. Also, the semitrailer was shown by pictures and the testimony of other witnesses to have been on top of the pickup and not on top of Gale's automobile.

We see nothing in the case to indicate that plaintiff-Gale was intentionally falsifying or that he was making a bona fide admission against interest. This court could hardly claim to be a court of justice if it did not recognize that an injured party, whose testimony consists of a narration of events as they appeared to him at or immediately prior to the happening of an accident causing serious injury and unconsciousness, is not conclusively bound by his own testimony as against other evidence which the fact-finding body might fairly believe.

Holdings to this effect and to the effect that the jury is not bound by evidence which is introduced by a party and which negatives his claim have been made in the following Pacific-state cases: Gibson v. Mendocino County, 16 Cal.2d 80, 105 P.2d 105, 108; Holland v. Morgan & Peacock Properties Company, 168 Cal.App.2d 206, 335 P.2d 769, 773; Valdin v. Holteen, 199 Or. 134, 260 P.2d 504, 509; Dahlgren v. Blomeen, 49 Wash.2d 47, 298 P.2d 479, 481–482; Gioldi v. Sartorio, 119 Cal.App.2d 198, 259 P.2d 62, 65; Green v. Floe, 28 Wash. 2d 620, 183 P.2d 771, 772. See also Alamo v. Del Rosario, 69 App.D.C. 47, 98 F.2d 328, 331; Annotation 169 A.L.R. 798, 809; and 9 Wigmore, Evidence, § 2594a, pp. 597–601 (3d Ed.)

In the Holland case cited above, at 335 P.2d 773, it was pointed out that the jury is charged to determine the truth on *all* the evidence. Thus, it is clear that testimony of a plaintiff which negatives his claim, especially where it relates to facts at the time of and immediately prior to serious injuries and unconsciousnes, does not bind the jury.

It is quite evident from the verdict rendered in the instant case that the jury considered Gale confused and mistaken as to the manner in which his accident happened. That is borne out by the fact that it found in favor of defendant-Kay and against defendant-Hilliard, thereby showing that it was disregarding plaintiff's testimony to the effect that he collided with Kay's semitrailer and not with Hilliard's wrecker.

## New Trial

The court instructed the jury in this case that negligence is "the" proximate cause of an injury which follows such negligent act, if it can be fairly said that, in the absence of such alleged negligence, the injury and damage complained of would not have occurred.

It might have been better if the reference had been to "a" proximate cause rather than to "the" proximate cause, for the reason that the jury may have thought the accident would not have happened except for Hilliard's negligent maneuvers in Gale's lane of traffic, without flares. If the jury did so think, its verdict against Hilliard and his employers may have been considered more or less mandatory, without reference to the matter of contributory negligence.

The question of proximate cause, in negligence actions, is ordinarily considered to be a question of fact for the jury or other trier of facts. 65 C.J.S. Negligence § 264, p. 1183. In the instant case, however, the trial court set aside the jury's verdict and granted judgment for the defendants, notwithstanding such verdict, because it considered the evidence insufficient to establish negligence on the part of Hilliard as the sole proximate cause of the collision.

This was done without pointing out wherein, if at all, the jury had failed to follow instructions given by the court. The situation suggests a possible misunderstanding between court and jury as to the basis on which proximate cause was to be determined.

■ Instructions, it has been said, are directions in reference to the law of the case guiding the jury in arriving at correct conclusions. Midland Valley R. Co. v. Pettie, 196 Okl. 52, 162 P.2d 543, 546. See also Champagne v. Department of Labor and Industries, 22 Wash.2d 412, 156 P.2d 422, 425.

■ But apparently the instructions in this case failed to guide the jury to the conclusion which the court considered correct, as far as the matter of proximate cause is concerned. This gives us some concern, because we think the jury had no way of knowing what principles of law relative to proximate cause the court was going to apply after its verdict.

In addition to our concern on the matter of proximate cause, we notice the trial judge specified in his final judgment that in the event the case is reversed, a new trial should be granted, unless a certain remittitur is made from the verdict of the jury. This, of course, denotes an opinion on the part of the trial court to the effect that the verdict was excessive.

All of these things considered, we think the circumstances here are such that the case should be remanded for a new trial as against the defendants Hilliard, Thomas and LeBar Motor Company, but not against Kay.

Reversed and remanded for new trial as to the defendants specified.

Mr. Justice HARNSBERGER (dissenting).

The reasoning of the majority is as incomprehensible to me as the jury's verdict seemed to be to the district court which set aside that verdict and rendered judgment for the defendants notwithstanding.

Although I continue to retain a high regard and respect for the views of my colleagues, that must not deter me from setting forth the reasons why it should be apparent they are so gravely in error in this appeal. I believe the record conclusively shows the conclusions reached and relied upon by the majority have only been arrived at by entirely unjustified speculation rather than from evidence or fair inferences justly

drawn therefrom and in complete disregard of undisputed and unchallenged testimony of witnesses whose credibility has never been questioned, even including plaintiff's own testimony as to what happened before he lost consciousness. There are at least four such speculations.

1. The court speculates that the place where the wrecker turned around, which was some 200 feet distant from the place where the accident occurred, "would have been a good place" to leave the wrecker and set up flares. Section 31–211, W.S.1957, dealing with required use of flares, only makes those provisions applicable to vehicles "disabled upon the traveled portion of a highway or the shoulder thereof." Even if it be assumed that provision should include any "stopped" vehicle, whether disabled or not, paragraphs (2) (I) and (II), of the statute require a flare to be placed 100 feet, not 200 feet, from the vehicle. Although it is true that the failure to place flares or other warning signals at some proper distance from a stopped or disabled vehicle on the traveled portion of a highway may, independent of statute, be considered negligence under some circumstances when the statute itself prescribes the distance at which such warning signals shall be placed from the disabled or stopped vehicle, a compliance with that statutory requirement would absolve from negligence on that score while placing flares at double that distance would not. However, the discussion is somewhat moot because the wrecker in question was struck from behind by plaintiff's car not while it was either disabled or stopped upon the highway, but was in lawful operation thereon.

2. The court next speculates that "an ordinarily careful * * * driver would have stopped off the traveled portion of the highway." Just why this speculation was indulged is unclear when the undisputed fact is that the wrecker was traveling on its own side of the road at the cautious speed of from two to four miles an hour when it was struck from behind by plaintiff's car. Also, the majority characterization of the wrecker's travel as "maneuvering" unjustly and inaccurately suggests that the wrecker's travel-movement was something other than being merely driven slowly on its own side of the highway at the time it was struck from behind by plaintiff's car. The undisputed and unchallenged testimony of the wrecker driver, whose credibility was not attacked in any way when explaining why no flares were put out, was, "I hadn't had my vehicle stationed [stopped] yet," and his further statement that he "was going to put out flares as soon as I got pulled back up into position." Again the majority's statement that the wrecker driver had testified he had not put out flares or *flashing signals* is misleading because it suggests there were no flashing signals used by the wrecker. To the contrary, the undisputed and unchallenged testimony showed the revolving, flashing light-signal on top of the wrecker cab was continuously in operation and continued in operation long after the accident; that all the warning lights required by law for such a wrecker vehicle were in full operation when the wrecker was struck from behind by plaintiff's car as the wrecker was lawfully in motion traveling on its own side of the highway.

3. The court improperly speculates that the position for the wrecker to pull out the Buick would necessarily be "a position somewhat across the highway." Even the majority opinion confesses it has "no way of knowing where" that position would be, but nevertheless the opinion contents itself by assuming the court's speculative premise that the wrecker had to be in "a position somewhat across the highway," satisfied the jury and "had a part in the jury's determination." If the majority is correct in its assumption, then the jury's verdict was not based on substantial evidence, but was based upon pure, unacceptable speculation.

4. Also, the opinion, after describing the position of the wrecker following the accident, speculates that the position of the wrecker, "means it was far enough on the highway, when struck, so that it made such a turn without going into the barrow pit."

This surmise is not only in direct contradiction to undisputed testimony, but it offends against the physical facts as they were testified to by witnesses who described the positions of the vehicles after the accident. Those testimonies all show it was the *right* front of plaintiff's car which struck the *left* rear of the wrecker. There was no evidence that plaintiff's car approached the wrecker from the *left* side of the highway or from the left side of the wrecker. On the contrary, the only evidence was that the wrecker was traveling straight down the highway on its own side of the road, and that plaintiff's car approached it from the rear, which of course would also be on the plaintiff's own side of the road. Under these circumstances, in order for the right front of plaintiff's car to strike the left rear of the wrecker, it was necessary for plaintiff's car to strike the wrecker either when the car was farther to the left side of the right-hand side of the highway or when plaintiff's car, in attempting to pass the wrecker, was turning to the left, not coming from the left. This accords with plaintiff's testimony and the sketch he made, which was received in evidence as plaintiff's Exhibit 10, that, when he attempted to pass the vehicle he saw in front of him, he turned to the left. Such an approach gives plain inference—not speculation—that plaintiff, coming suddenly upon the slow moving wrecker at a speed of 40 miles an hour, which by plaintiff's own statement was from five to ten miles an hour in excess of a permissible speed under the blizzard conditions and icy roads, in a split-second effort to avoid striking the wrecker, turned his car as much to the left as was possible, but, nevertheless, struck the wrecker turning it in a clockwise direction, after which the wrecker was again struck by the semitrailer and then came to rest facing in the position in which it remained after the accident. This position of the wrecker was the position testified about by the witnesses who arrived after the accident. It was not the position where the wrecker stopped after being struck only by plaintiff's car. The plaintiff's car, after striking the wrecker,

came to a stop and remained facing somewhat in the same direction as the wrecker was facing after it had been struck a second time by the semitrailer. These physical facts tend to corroborate the wrecker-driver's account of what happened.

Finally, the majority opinion is subject to a further just criticism in deciding the case should be remanded for new trial. If its conclusions, even those based upon unjustified speculation and failure to regard undisputed and unchallenged evidence and physical facts, must control the disposition of this case, there is no justice or excuse in remanding for a new trial. The controlling opinion is based upon the jury's right to decide and this court's conclusion that there was sufficient, substantial evidence to warrant the verdict they returned. In consequence, the only proper disposition to be made is to remand with direction to reinstate the verdict and render judgment accordingly.