[No. 29807. Department Two. April 8, 1946.]

ROSWELL P. BLODGETT, *Appellant*, v. CLAUDIA C. LOWE, *Individually and as Administratrix, Respondent.*[1]

[1] Reported in 167 P. (2d) 997.

*John C. Hurspool*, for appellant.

*George W. Thompson*, for respondent.

JEFFERS, J.—Plaintiff, Roswell P. Blodgett, brought this action in the superior court for Walla Walla county, against Claudia C. Lowe, individually and as administratrix of the estate of Josephine Buroker, deceased, for specific performance of an oral contract claimed to have been made and entered into between Josephine Buroker, now deceased, and plaintiff on or about February 10, 1924, whereby it is claimed that Mrs. Buroker agreed that, if plaintiff would refrain from filing a claim against the estate of Jonas Buroker, deceased, husband of Josephine Buroker, and would remain and care for Mrs. Buroker while she lived, she would, at her death, give plaintiff all her property. The prayer of the complaint is that this agreement be specifically enforced as an agreement to devise to plaintiff all the estate of Josephine Buroker, deceased.

Defendant's answer denied all the material allegations of the complaint.

The cause came on for hearing before the court on July 20, 1945. At the opening of the case, the court asked the following question:

"THE COURT: This is an action brought by the plaintiff for specific performance and an alleged agreement to make a deed to certain property which is denied by the defendant; is that correct? MR. HURSPOOL (attorney for plaintiff): Yes. Do you want a statement?"

At the close of plaintiff's case, defendant moved to dismiss the action on the ground that the evidence did not support the allegations of the complaint, more particularly that there was no proof of any oral contract recognized by Mrs. Buroker. The court indicated that it would deny the motion at that time, whereupon defendant stated she had no testimony to offer. After some argument the court stated:

"There is nothing in the evidence to show a contract. I can't see where you should be entitled to recovery. I think the authorities will sustain me all the way down the line and that will be the judgment of the court."

Judgment was entered July 21, 1945, dismissing plaintiff's action with prejudice.

Plaintiff has appealed from the judgment entered and assigns as error (1) the action of the court in excluding the testimony of appellant as to the kind and amount of the services he had rendered to Mrs. Buroker; and (2) the holding by the court that the proof was insufficient to establish a contract by Josephine Buroker that appellant should have her property upon her death.

We shall first discuss the question raised by the second assignment of error.

The first witness called was appellant. He did not, of course, attempt to testify to any specific contract with the deceased. Appellant had known the deceased for nearly forty years prior to her death, and had known Mr. Buroker prior to his death. He had lived in the Buroker home from 1920 until Mrs. Buroker's death in February, 1943. The question was then asked: "Q. What did you do in that home, if anything, while Mr. Buroker lived?" At this point, there was an objection made by counsel for respondent, and, after considerable colloquy between court and counsel, the court stated: "I think I will let him answer that."

"Q. What did you do in that home, if anything, while Mr. Buroker lived? A. I drove his car and done all the work I was supposed to. Q. Tell what you did? A. I cooked, washed and ironed, drove the car to Portland, painted for him and painted for Mrs. Lowe. Q. Was that while Mr. Buroker was living? A. No, I painted for him. THE

COURT: I think the way it sounds that comes within that transaction,—he did it for her or did it for him. It is discussions and transactions with the deceased. The Court will strike that. Q. Did you cook? A. I cooked, yes, sir. Q. Did you wash? A. Yes, sir. Q. Did you do the ironing? A. Yes, I did. MR. THOMPSON (attorney for respondent): I think if the Court please he can testify to what he did. A. I drove her car and his car wherever he wanted to go and she wanted to go. THE COURT: I am not going to consider that testimony. I think that is violating the rule and I am not going to consider it. Q. Do you know when Mr. Buroker died? A. In 1924. I think it was 1924. Q. After his death did you still reside with Mrs. Buroker? A. I did."

An objection to the last question was made by counsel for respondent, but the court permitted it to stand.

"Q. What did you do in Mrs. Buroker's house during the time you resided there after Mr. Buroker died? [Objection by counsel for respondent.] A. Well, I cooked and washed and ironed and took care of the lawn and drove her to Tacoma, and Portland and Spokane and done everything that was to be done. THE COURT: I think that comes within the rule and I will sustain the objection. MR. HURSPOOL: As to all of it? THE COURT: Yes, I think it comes within the rule as part of a transaction with the decedent. MR. HURSPOOL: I think the testimony that he drove her to Spokane and such things might come within the meaning of a transaction with her, but cooking and washing and ironing and taking care of the lawn would not any more than the testimony regarding cooking in the *Ah How v. Furth* case [13 Wash. 550, 43 Pac. 639]. THE COURT: I can't see how you can get it away from the transaction with her."

Appellant further testified that he was a paperhanger and painter by trade, but that, after he went to live with the Burokers, he did very little at his trade; that, since Mrs. Buroker's death, he had worked steadily at his trade.

While the testimony of appellant as above set out perhaps has more application to the first assignment of error, we have quoted it for the purpose of showing what appellant claimed he did. We shall later refer to this testimony and the rulings of the court in regard thereto.

In addition to appellant, seven witnesses were called. Their testimony is brief, and we shall set out that portion of

the testimony which it is contended had a bearing on the claimed contract.

Mrs. Mary D. Dahlen had lived in Walla Walla since 1910, and had known Mrs. Buroker during that time. They were good friends. She testified that she knew Mr. Blodgett, and that he lived with Mrs. Buroker.

"Q. Do you know what he did in the home? A. Yes. He washed, ironed, scrubbed and painted and ran the car and chopped wood and piled wood and got the meals and did everything. . . . Q. State whether or not you had any conversation with her relative to Mr. Blodgett's care for her? A. What do you mean by that? Q. Did you ever talk or did she ever talk to you about his looking after her? A. Yes she did and she liked him very well. Q. Did you ever have any conversation about any compensation he was to receive? A. Yes everything was to go to him. Her daughter and granddaughter were taken care of and everything would go to him. She was taking care of him. She said that several times. Q. Everything was to go to him that was the purport of her remarks? A. Yes, everything she had left, yes, absolutely everything. . . . Q. Did she say anything about paying him any money? A. No, she had never paid him any money. Q. Did she say anything about that? A. No, she never said anything."

Sam Gallo testified that he had known Mrs. Buroker about four years; that any time he was at the Buroker home, Blodgett was there.

"Q. Doing work? A. Doing chores. Q. What was he doing? A. He would have an apron on. Q. What was he doing with an apron on? A. Washing dishes or something in the house. . . . Q. Did you ever have any conversation with Mrs. Buroker about his care of her? A. On a picnic at Jefferson Park. . . . Q. What conversation was had with her? A. My wife and I were there, we were eating chicken, we made a lunch ourselves. We were discussing things and she was pretty happy, she said 'Rose is pretty good to me' that there was one thing Rose wouldn't have to worry after she passed away. [We assume Rose refers to appellant.] Q. Did she explain that further? A. No. Q. Did you have any discussion how she was disposing of her property? A. No. . . . Q. Did she say anything further at all as to what she meant that he would have plenty when she was gone? A. No. I couldn't remember."

Mrs. Gallo, called as a witness, gave a little different view of what Mrs. Buroker stated at the picnic. She testified that Mr. Blodgett was always working around on the flowers or inside when she was there; that several times he was cooking meals.

"Q. You heard your husband's testimony relative to a conversation which you and he and she had at Dreamland Park, were you present? A. Yes. Q. Tell the Court just what you heard? A. Her words were,—my husband didn't get it quite right,—she said,—she had sent Blodgett to get some beer, he wasn't there,—'Blodgett is very good to me. He is very kind. If I would die before him he won't have a thing to worry about. He don't expect me to leave him all this money, but I will. I will see that he is well taken care of' because he was so kind to her, she said."

Ralph Lockard testified he knew both appellant and Mrs. Buroker; that when he had been at the Buroker home Blodgett would be doing whatever there was to be done, such as washing, cooking, washing the dishes, mowing the lawn; that he drove Mrs. Buroker's car and took care of it. The witness stated that Mrs. Buroker told him: "If anything happens to me I know Mr. Blodgett is going to be taken care of." He testified that Mrs. Buroker told him "that what she had left would go to Mr. Blodgett."

Royce Lockard testified that he had lived in Walla Walla about thirteen years; that he was a friend of Mr. Blodgett and Mrs. Buroker; that he had seen Mr. Blodgett at Mrs. Buroker's home, and that he was usually helping around the kitchen or in the yard.

"Q. Did you ever have any conversation with Mrs. Buroker as to how Mr. Blodgett was caring for her? A. Well, we remember several times her saying how good he was to her and she always called him her handy man and she didn't know what she would do without him. Q. Did you ever hear her say anything about what would happen on her death? A. Well, I have heard her say as I remember that because of the way he took care of her how she was going to repay him. He was so good to her that she would some day repay him if anything happened to her. Q. Was there ever any remark as to what she was going to give him? A. There was so much talk and so many times, I couldn't

answer that. I think there was a few times that she remarked she was going to leave all her money to him that she was going to take good care of him."

This witness is a brother of the witness who preceded him.

Zella Lockard, who is Royce Lockard's wife, had known Mrs. Buroker since about 1935. She had seen Mr. Blodgett wash, iron, scrub floors, chop wood, paint, fix fires, mow the lawn, and fix the car. She testified that Mrs. Buroker stated to her that Mr. Blodgett took very good care of her; that, if she (Mrs. Buroker) passed on before Mr. Blodgett did, he would be well taken care of.

"Q. Was anything said specifically what property he would get? A. Not to my memory. Q. Did you hear her say that more than once? A. Several times."

Pete Locati testified he had known Blodgett about twenty years and had known Mrs. Buroker. This witness stated that he had Blodgett do some work for him, and that, when he went to pay him, Mrs. Buroker said: "Don't bother about paying him when I am gone he is going to be well taken care of."

At this point, appellant rested, and the motion hereinbefore mentioned was made.

It will be noticed that no witness purported to testify that he or she knew personally of the terms of any contract between appellant and Mrs. Buroker, or that Mrs. Buroker ever referred to any contract.

Many cases of this character have been before this court, and we have very definitely announced and adhered to the rule stated in *Aho v. Ahola*, 4 Wn. (2d) 598, 600, 104 P. (2d) 487:

"In order to establish an agreement of that kind, it is necessary that an oral promise to make a will or an oral contract to devise or bequeath property must be established 'by evidence that is conclusive, definite, certain, and beyond all legitimate controversy.' *Resor v. Schaefer,* 193 Wash. 91, 74 P. (2d) 917."

We have very recently again announced the above rule in the case of *Dau v. Pence,* 16 Wn. (2d) 368, 133 P. (2d)

523, and, in that case, we referred, among others, to the cases of *Henry v. Henry,* 138 Wash. 284, 244 Pac. 686; *Wayman v. Miller,* 195 Wash. 457, 81 P. (2d) 501; and *Aho v. Ahola, supra.* We quoted from the *Henry* case, *supra,* as follows:

" 'We are prepared to make, and are justified in making, a statement even more stringent than that, and to hold that one seeking to establish an oral contract, whereby property of the deceased is sought to be taken, must establish *all the elements of the contract* and a right to have it enforced *beyond all reasonable doubt.* Without such a rule, no estate of any considerable size is safe from claims that it has been devised and bequeathed by word of mouth.' " (Italics ours.)

In order to establish a contract such as here alleged to have been made, it is necessary that the person asserting it show, by evidence that is conclusive, definite, certain, and beyond legitimate controversy (1) that a contract as alleged was entered into between the deceased and the person asserting the contract; (2) that the services contemplated as consideration for such agreement have been actually performed; and (3) that such services were performed in reliance upon the agreement. See *Dau v. Pence, supra.*

We are of the opinion that proof should be made in the order above indicated. There are many reasons why the terms and conditions of an alleged contract should be established before evidence of services claimed to have been performed pursuant to the terms of the alleged contract is admissible.

We are unable to see how a trial court could pass upon whether or not certain acts of one asserting such a contract were relevant or material, unless and until it was shown by competent evidence that there was such a contract, and the terms and conditions of such contract disclosed.

We are of the opinion the instant case is typical of the situation last above referred to. While we are of the opinion the services performed by appellant in and around the home of Mrs. Buroker might have afforded ample consideration for an agreement, how was it possible for the trial court to say that the services performed by appellant were

the services contemplated by the agreement, until an agreement was shown to have been made?

■ We are clearly of the opinion that the evidence in this case wholly fails to show that deceased ever made or entered into a contract with appellant, such as alleged. This being true, it follows that the evidence wholly fails to show that the services performed by appellant were so performed in reliance upon the alleged contract.

All the testimony of the several witnesses who testified in this case shows, is that Mrs. Buroker indicated that she intended to make some provision for appellant upon her death, because he had been good to her, but no witness testified that deceased made any statement directly or to the effect that any provision to be made by her for appellant was based upon any agreement, or the terms of any agreement, or specifically, because appellant was to take care of her for the balance of her life.

■ We appreciate, of course, that in a trial to the court, the court has a wide discretion in the order of proof, but certainly in a case of this character, as in any other where a specific contract is the basis of the action, the trial court would be justified in refusing to admit evidence which might tend to show that the conditions of a claimed contract had been performed until such a contract had been established, thereby enabling the court to tell whether or not such conditions had been performed.

We shall now revert to appellant's first assignment of error.

It will be remembered that the trial court sustained an objection to some of the testimony of appellant in regard to what he did in the Buroker home. After appellant had called all of his witnesses but one, he again took up with the court the question of appellant's right to testify as to what he did in and around the Buroker home, presumably for the purpose of showing that appellant did what it was agreed he should do under the claimed agreement. We shall now refer to what took place between the court and counsel for appellant:

"MR. HURSPOOL: If the Court please, I referred to another citation in regard to the admissibility of the testimony of Mr. Blodgett. That is the case of *Slavin v. Ackmann,* 119 Wn. page 48 [204 Pac. 816]."

In the cited case, the deceased (Ellen Conley) had in 1910 written a letter from her home in Auburn, Washington, to her daughter, respondent, who was then living in Troy, New York. We quote part of the letter:

" 'Nellie, I want to ask you if you will come out here and take care of me. I am old now, and Kate don't come only when she wants money from me. If you will come out here and take care of me I will give you this little home for taking care of me. . . . Sell all your furniture and you can have mine and Marie can get good work here in the post-office.' "

The opinion states that upon receipt of the above letter, respondent sold her property in New York and came to Auburn to her mother's home, where she continued to reside from the day of her arrival until her mother's death, with the exception of a few weeks. The opinion further states that respondent did everything which was contemplated by the letter. The opinion continues:

"There are various objections to the decree of the court granting relief to Mrs. Slavin, the respondent. The first of these is that Mrs. Slavin, by virtue of § 1211, Rem. & Bal. Code, was incompetent to testify. It is true that an interested person cannot testify as to any transaction had by him with, or any statement made to him by, any deceased person, but the testimony offered by the respondent while she was on the stand was not as to any transactions with the mother. She testified that she had received the letter hereinabove set out. We have held that such testimony is not testimony as to a transaction with a deceased person. [Citing *Bardsley v. Truax,* 64 Wash. 400, 116 Pac. 1075, and other authority.]

"She also testified as to the *acts which she did in conformity with the letter of her mother.* We said in *Ah How v. Furth,* 13 Wash. 550, 43 Pac. 639:

" 'The testimony of respondent that he worked at the house of the intestate and the character of the work performed by him, was not testimony in relation to a "transaction had by him with, or any statement made to him by,"

such intestate. Such testimony related solely to acts of the witness alone, and was, we think, entirely competent.'" (Italics ours.)

We have given considerable thought to the *Ah How* and *Slavin* cases, *supra,* and it seems to us the situation presented in both those cases is different from that presented in the instant case. In the *Slavin* case a letter from the deceased was produced, and, we assume, properly identified and admitted in evidence. This letter set out the terms of a proposed agreement. That being the situation, we held respondent could testify as to acts which she did in conformity with the letter from her mother.

In the *Ah How* case, an action was brought against the administrator of the estate of Henry Yesler, deceased, to recover from the estate for services performed as a domestic in the family of the deceased. The court found, presumably upon competent evidence, that there was a contract of employment of the respondent by the deceased for an indefinite period, at the agreed wage of sixty dollars per month. The contract having been established, it is perfectly understandable why, and upon what theory, respondent, when called as a witness, was permitted to testify that between February, 1882, and October, 1891, he did the cooking, washing, and ironing at the home of the deceased.

After Mr. Hurspool had referred to the *Slavin* case, *supra,* the following occurred:

"THE COURT: Did you give that in the *Bass* case? MR. HURSPOOL: I did. In that case the witness had been asked what she did to live up to the terms of that contract, which was taking care of her mother, and she was allowed to testify to it. I want to call the Court's attention to it. So at this time I would like to make an offer of the testimony of Mr. Blodgett. THE COURT: Is there anything that Mr. Blodgett has that he can show anything like that? MR. HURSPOOL: I think that is all I have. THE COURT: I think you have given enough and I will give such weight to it as it is entitled to receive and I will take it that it was testified to that way."

No further offer of proof was made by counsel for appellant, and apparently he understood, as do we, that the court

would consider appellant's testimony in regard to what he did in and around the Buroker home.

However, had the trial court refused to consider appellant's testimony as to what he did in and around the Buroker home, such action by the trial court would not warrant a reversal of the judgment entered, for, assuming that appellant should have been permitted to testify to what he did, such testimony in and of itself would not tend to prove that a contract had been made, or the terms of such contract.

Having concluded that the evidence was insufficient to establish the contract alleged to have been made, which evidence, as indicated, shows that several of the witnesses, called by appellant, testified specifically that appellant performed services around the Buroker home of the same kind and character as appellant testified to, the action of the trial court in striking appellant's testimony could not have been prejudicial. His testimony would have been only cumulative.

For the reasons herein assigned, we are of the opinion the judgment of the trial court was right, and it is affirmed.

· DRIVER, C. J., BEALS, BLAKE, and ROBINSON, JJ., concur.