[No. 37101. En Banc. November 18, 1965.]

BEATRICE HUMPHRIES, *Appellant,* v. DALE RIVELAND *et al.,* *as Coadministrators, Respondents.**

*Reported in 407 P.2d 967.

*Horace H. Davis* and *William R. Roetcisoender,* for appellant.

*Terhune, Schlosstein, Riveland & Elliott (Dale Riveland,* of counsel), for respondents.

DONWORTH, J.—Appellant filed a claim against the estate of Edward J. Humphries (who died April 9, 1962) for $30,000 or, in the alternative, for one half of the value of the real and personal property in his estate. This claim was rejected by respondents, who are coadministrators of Mr. Humphries' estate, and she instituted this action against them in their representative capacities.

In her complaint, appellant alleged that she and the decedent had lived together for 13 years and that they had shared their earnings and resources, including their income and efforts, and had purchased property with their combined earnings, most of which was placed in the decedent's

name. Respondents claimed that all of this property was a part of the estate, whereas appellant alleged that she owned a half interest therein.

Her claim (as alleged in her complaint) was based on an alleged contract alternatively stated as follows:

1. That the principal assets owned by the two parties was their house which was built with money and labor supplied from both Beatrice Humphries and from Edward J. Humphries. That the plaintiff, Beatrice Humphries, did a great deal of the work in building the house owned by the two parties. That the plaintiff and the deceased had always considered that each had a one-half interest in said property, even though they were not husband and wife.

or

2. That the administrators held in trust for appellant's benefit a one-half interest in the real property occupied by appellant and the decedent at the time of his death, known as number 13742-41st Avenue N. E. in Seattle (herein referred to as the home property); or

3. That the decedent and appellant were partners at the time of his death, and that the building constructed on the home property was a partnership project, and hence she is entitled to a one-half interest therein, or

4. That the decedent and appellant were joint adventurers, and hence she is entitled to one half of the home property which was created by the joint adventure.

At the time appellant began this action (which was 7 months after the decedent's death) she was still in possession of the home property and had refused to vacate the premises.

Accordingly, respondents in their answer, besides denying the material allegations of the complaint, sought to obtain exclusive possession thereof.

Briefly stated, the testimony at the trial concerning the background of the relationship between appellant and the decedent is as follows:

The decedent was married to Susan Humphries in 1926. He and his wife lived together until May, 1945, when they separated. They had six children.

In July, 1947, his wife started an action for divorce on the ground of physical cruelty and personal indignities. A default interlocutory decree was granted to her in October, 1947, by which she was given the custody of three of their minor children and he was awarded custody of two minor sons. The decedent was ordered to pay his wife $25 per month for each child in her custody and $50 per month for her own support. She was given one parcel of real estate and he was awarded two other parcels. This decree became absolute August 11, 1949, and thereupon the decedent became free to marry.

Shortly prior to this time, the decedent and appellant (who was then about 45 years of age) commenced living together as husband and wife, and so represented themselves to others. In fact, several of their neighbors and friends testified that they were very surprised to learn after decedent's death, on April 9, 1962, that these parties were not married.

Several years after the decedent and appellant commenced living together, he entered into an agreement with a contractor to construct the house on the home property. He paid the contractor $16,500 in cash at that time (which the contractor thought was in 1953). The contractor used this money to purchase in his own name the lots on which the house was built and to start the construction. After the house was partially constructed, work was suspended for about a year. Appellant and the decedent moved into the house in 1954 after the first phase of the work was done.

The contractor and his wife, on March 23, 1955, conveyed the property to the decedent by deed, in which he was named as the sole grantee. This was done after a conference with appellant, the decedent, and the grantors was held as to how the transaction was to be consummated. Construction work was resumed at this time and the house was completed in December, 1955. The property was appraised as of the date of the decedent's death in 1962 at $42,000.

There was other testimony relating to the decedent's

financial status and earning capacity, which will be referred to later.

Appellant's claim to a half interest in the home property appears to be based on her allegation that she and the decedent "had always considered that each had a half interest in said property," and on the very substantial work which she had performed in assisting him in improving the house and yard, such as painting and papering, and in doing a "man's work" in building a bulkhead and rockery and planting shrubbery and similar work.

■ Under the decisions of this court in similar cases, the trial court must, before considering the nature and amount of services allegedly rendered to the decedent by the claimant, decide whether a contract existed, and, if so, what the provisions of the contract were.

In *Blodgett v. Lowe,* 24 Wn.2d 931, 167 P.2d 997 (1946), the plaintiff had lived in decedent's home for 23 years and had cooked, washed, ironed, had taken care of the lawn and driven her car for her and had performed other similar services at her request. Several witnesses testified as to statements made to them by decedent to the effect that she was going to leave all her money to the plaintiff and other similar statements. After reviewing several of our prior decisions on the subject, this court said:

> In order to establish a contract such as here alleged to have been made, it is necessary that the person asserting it show, by evidence that is conclusive, definite, certain, and beyond legitimate controversy (1) that a contract as alleged was entered into between the deceased and the person asserting the contract; (2) that the services contemplated as consideration for such agreement have been actually performed; and (3) that such services were performed in reliance upon the agreement. See *Dau v. Pence, supra* [16 Wn.2d 368, 133 P.2d 523 (1943)].

> We are of the opinion that proof should be made in the order above indicated. There are many reasons why the terms and conditions of an alleged contract should be established before evidence of services claimed to have been performed pursuant to the terms of the alleged contract is admissible.

We are unable to see how a trial court could pass upon whether or not certain acts of one asserting such a contract were relevant or material, unless and until it was shown by competent evidence that there was such a contract, and the terms and conditions of such contract disclosed.

We are of the opinion the instant case is typical of the situation last above referred to. While we are of the opinion the services performed by appellant in and around the home of Mrs. Buroker might have afforded ample consideration for an agreement, how was it possible for the trial court to say that the services performed by appellant were the services contemplated by the agreement, until an agreement was shown to have been made?

We are clearly of the opinion that the evidence in this case wholly fails to show that deceased ever made or entered into a contract with appellant, such as alleged. This being true, it follows that the evidence wholly fails to show that the services performed by appellant were so performed in reliance upon the alleged contract.

All the testimony of the several witnesses who testified in this case shows, is that Mrs. Buroker indicated that she intended to make some provision for appellant upon her death, because he had been good to her, but no witness testified that deceased made any statement directly or to the effect that any provision to be made by her for appellant was based upon any agreement, or the terms of any agreement, or specifically, because appellant was to take care of her for the balance of her life.

Appellant failed to prove the existence of any contract with the decedent (written or oral) as required by the rule quoted in the *Blodgett* case.

In her complaint, appellant sought to establish an undivided half interest in the home property on one of four alternate theories, as above stated. Each basis for recovery necessarily rests upon proof of the existence of a contract between her and the decedent prior to his death. As the trial court in effect found, no contract of any kind was proved to exist between them with reference to the home property. Therefore, since (as stated below) we have accepted the findings of fact in the present case as verities, under the *Blodgett* case, we have no occasion to pass upon

the factual questions of whether the services allegedly rendered by appellant were actually performed, and, if so, whether they were performed in reliance upon the alleged contract.

While the present case does not specifically involve an alleged promise by the decedent to devise any interest in the home property to appellant in consideration of her labors in connection with the construction of the house and landscaping of the yard, our en banc decision in *Jennings v. D'Hooghe,* 25 Wn.2d 702, 172 P.2d 189 (1946), is of interest because appellant of necessity must rely on some kind of an alleged *oral* contract with the decedent whereby she acquired a half interest in the home property prior to his death.

In the *Jennings* case, we referred to the Statute of Wills (RCW 11.12.020) and to the statutory provisions relating to the conveyance of real estate or any interest therein (RCW 64.04.010), and then said:

> We also have in mind the following rule:
> Cases of this kind are not favored and, when the promise rests in parol, are even regarded with suspicion, and will not be enforced except upon the strongest evidence that it was founded upon a valuable consideration and deliberately entered into by the deceased. *Alexander v. Lewes,* 104 Wash. 32, 175 Pac. 572. (p 704)

The foregoing rule was quoted with approval in the recent en banc case of *Bicknell v. Guenther,* 65 Wn.2d 749, 399 P.2d 598 (1965), which involved an alleged promise to devise a certain farm to the owner's employee.

At the commencement of the trial of the present case, the parties filed a stipulation as to certain facts regarding certain items of cash and real property received by decedent during the period of cohabitation. It concluded:

> Plaintiff claims an interest in receipts and property herein listed, except Workmen's Compensation benefits referred to in 2. above. Plaintiff hereby stipulates only to receipts and/or record title in Edward J. Humphries, and the above stipulations shall not be construed as a waiver of her claim of an interest therein, nor as any acknowledgment of the ultimate source of funds.

In the present case, the trial court made certain findings (among others) that:

III. The deceased, Edward J. Humphries, accumulated an estate which has been appraised at the value of $56,-252.31. That all of said estate, with the exception of certain furniture and personal effects, the ownership of which the defendants do not dispute, was held in the name of Edward J. Humphries. That the principal asset of the estate is a dwelling house located on Lots 6 and 7, Cedar Park No. 5, King County, Washington, having an address of 13742 41st Avenue, N. E., Seattle 55, Washington, which dwelling house has been appraised at the value of $42.000. That Edward J. Humphries received title to said dwelling house in his name alone by deed dated March 23, 1955. Also, in the name of Edward J. Humphries was purchased or acquired a 1956 GMC truck, Serial No. 1528CK1308 and a 1949 Plymouth automobile, Serial No. P18193405; and certain household furnishings and personal effects and various accounts and receivables.

IV. That between the years 1949 and 1952, Beatrice Tyler worked regularly part-time in a cleaning establishment. Thereafter both Edward J. Humphries and Beatrice Tyler worked on the construction and finishing and landscaping of the dwelling house at 13742 41st Avenue, N.E., Seattle, Washington. Edward J. Humphries worked and earned regularly, weather permitting, as a union brickmason and masonary contractor; Beatrice Tyler worked and earned part-time doing baby sitting and housework for other persons, and earned income during the time they were living together. On occasion, Beatrice Tyler assisted Edward J. Humphries in his masonary work. That it is not possible to trace the source of the funds which were used in the purchase of the property upon which the dwelling house was constructed, nor the funds which were used in the accumulation of the estate of Edward J. Humphries. Edward J. Humphries engaged in transactions and received cash receipts as set forth in Stipulations of Fact herein.

. . . .

VIII. There is no evidence that Beatrice Tyler contributed money to the acquisition or development of property set forth in Paragraph III above.

IX. That shortly before his death, Edward J. Humphries requested the services of a lawyer, and, when no

lawyer had been obtained prior to the time that he went into the operating room, said that he was sorry to have left Beatrice Humphries in this mess. That all of the expressions and intentions of Edward J. Humphries prior to said date are consistent with the relationship of keeping the property for himself.

X. That Edward J. Humphries knew about transferring, selling and buying property, and he did not do what he could have done to transfer his property.

XI. Decedent did not intend to convey to or create in Beatrice Tyler any ownership interest in the property in issue herein other than that set forth in Paragraphs V through VII above.

XII. Decedent and Beatrice Tyler were not partners or joint venturers in the acquisition or development of property in issue herein.

The trial court, in its conclusions of law, ruled that appellant was the sole owner of certain items of personal property listed therein and of a one-half interest in a certain promissory note for $2,900 (referred to as the Squier note).

The final conclusions stated:

II. Beatrice Tyler is the owner of and entitled to the proceeds of one-half of the obligation of Fred B. and Charlotte M. Squier to Edward J. Humphries and Beatrice Tyler in the amount of $2900 at the date of decedent's death. Beatrice Tyler is entitled to receive from defendants one-half of the proceeds of this obligation that defendants have received and do receive from Fred B. and Charlotte M. Squier.

III. Defendants administer the decedent's sole ownership interest of all other property inventoried in the Estate of Edward J. Humphries, King County Cause No. 167073, and are entitled to exclusive possession thereof.

IV. Any work done by Beatrice Tyler on property held in the name of Edward J. Humphries was done as a gratuity.

The judgment appealed from awarded to respondents, as administrators of the estate of Edward J. Humphries, deceased, all of the property inventoried by them therein except the items of personal property described therein and a one-half interest in the Squier note.

Appellant has assigned as error the making of certain portions of the trial court's findings and its refusal to make certain requested findings. We have considered these assignments, but, since there was substantial evidence to support the findings made, we accept them as verities.

Error is also assigned to the court's conclusions of law Nos. 2, 3, and 4. In the light of the decisions discussed herein, we are of the opinion that these conclusions are correct.

Appellant in her argument refers to *Creasman v. Boyle,* 31 Wn.2d 345, 196 P.2d 835 (1948), in which it was held that, where the man, while living in a meretricious relationship, permitted title to certain property to be taken in the name of his paramour (who thereafter died), the court would presume that the parties intended the grantee to be the owner thereof.

In *Iredell v. Iredell,* 49 Wn.2d 627, 305 P.2d 805 (1957), this court said regarding *Creasman:*

> Our holding in *Creasman v. Boyle, supra,* has been misconstrued. Property rights are not determined on the basis of social relationships, moral or immoral. *Poole v. Schrichte* (1951), 39 Wn. (2d) 558, 236 P. (2d) 1044. For reasons heretofore set forth in *Poole v. Schrichte,* pp. 562-3, and *Walberg v. Mattson* (1951), 38 Wn. (2d) 808, 232 P. (2d) 827 (See, also, *Dahlgren v. Blomeen* (1956) *ante* p. 47, 298 P. (2d) 479), our holding in the *Creasman* case has no application here. In *Walberg v. Mattson, supra,* p. 812, it is pointed out that in the *Creasman* case,
>
> "No evidence of actual intent of the parties was introduced since the woman was dead and Rem. Rev. Stat., § 1211 [*cf.* RCW 5.60.030] . . . prohibited the man from giving such testimony."
>
> In the *Creasman* case, *supra,* p. 356, we said, " . . . we think that, under these circumstances and *in the absence of any evidence to the contrary,* it should be presumed *as a matter of law* that the parties intended to dispose of the property exactly as they did dispose of it." (First italics ours.)
>
> Here there is "evidence to the contrary." For that reason, the presumption that the parties intended to dispose of the property "exactly as they did dispose of it" does not arise. *Walberg v. Mattson, supra.*

Appellant argues that the *Creasman* case does not apply to the facts in the case at bar. We agree, because the trial court here found that appellant contributed no money to the acquisition or development of the home property. The decedent took title thereto in his own name after discussing with appellant the possibility of including appellant as a joint grantee in the deed. He never thereafter executed any instrument in writing, conveying, or contracting to convey to appellant any interest in the property. The trial court further found that any work done by appellant on the home property was a gratuity. For the reasons stated above, we do not follow the *Creasman* rule in this case.

Appellant further argues that this court should follow the rationale of *Knoll v. Knoll,* 104 Wash. 110, 176 Pac. 22, 11 A.L.R. 1391 (1918), which was a divorce action in which the plaintiff wife in good faith believed that her marriage was legal. The trial court had denied her a divorce and this court reversed and remanded the case for the entry of a divorce decree and a proper division of the property of the parties. In the present case, appellant, at all times during the 13 years she lived with him, knew that she and the decedent were not married. Thus, she knew that she could acquire no interest in his property except by gift or contract.

We are not concerned in this case with any question of morals or of punishing appellant for openly cohabiting with the decedent. Persons in such relationship have the same right to contract with each other as domestic strangers, but we are unable to understand how, in the absence of any proof of a conveyance or contractual relationship (such as a deed of conveyance, partnership or joint adventure or a resulting trust) this court can *assume* that the parties had an agreement that property acquired by one of them was to be shared equally with the other.

Appellant also cites *Poole v. Schrichte,* 39 Wn.2d 558, 236 P.2d 1044 (1951), in support of her position in the case at bar. In the *Poole* case, the evidence established that the two parties, who were still living at the time of the trial, combined their limited resources to buy a beauty shop which the woman operated while the man worked as a

railroad switchman. Later he quit this employment because of an injury. The parties then purchased a tavern with their commingled funds plus two chattel mortgages (one on the fixtures and equipment in the beauty shop and the other on similar items in the tavern). Thereafter "[S]he ran the salon while he ran the saloon."[1] Sometime later, the beauty shop was sold and part of the proceeds was used to accelerate payments on a home which they were buying together. Eventually, the parties had serious differences and separated permanently. Mrs. Poole instituted an action to establish her interest in the tavern and other personal property. The trial court awarded her $5,000 for her interest in the tavern and a one-half interest in the personal property. He appealed. After discussing our prior decisions, this court said:

> We have here a situation in which, if the parties to this action had not been living together, there would be no question but that Mrs. Poole had at least a one-half interest in the tavern. Her rights do not stem from cohabitation or the meretricious relationship, but from the fact that the proceeds from the beauty shop she operated clearly constituted a larger proportion of the Crosley account than did Mr. Schrichte's earnings as a railroad switchman. The undisputed testimony is that the money that went into the down payment on the tavern was at least half hers; that her credit was pledged to make its purchase possible, and that she assisted in its operation during Mr. Schrichte's frequent illnesses and absences from the city. The other payments on the purchase price came from the operation of the tavern. We know of no rule of law or equity that says that if she lived with Mr. Schrichte knowing that she was not married to him, she thereby forfeited her interest in the tavern because he had the foresight to see that the legal title thereto stood in his name.

The facts shown by the record in the present case are very different from those involved in the *Poole* case.

Appellant consented to the title to the home property being placed in decedent's name in 1953. They moved into

---

[1]*Poole v. Schrichte, supra,* at 560.

this house in 1954 and lived there until decedent's death in 1962.

Regarding their respective funds, it was stipulated that the decedent received, between 1952 and 1955, a total of more than $26,000 from the sale of his property and sources other than his earnings. He was a bricklayer who was steadily employed until shortly before his death at $4.65 per hour. When appellant was in the east visiting her son in New York for three or four months during the summer of 1961, the decedent's former wife visited him about three days out of every week. She testified that at that time he requested her to count some currency which he then had in the house. The total was $7,886.

The only offer of proof made by appellant regarding her earnings (which the trial court rejected) was that she had earned approximately $600 per year from 1952 to 1961. She claimed that this amount was placed in a common fund, but did not state for what purpose it was used.

Appellant's only basis for her claim to a half interest in decedent's estate is based upon evidence of the services rendered to him during the last 13 years of his life, such as housework (cooking, cleaning, washing, etc.) and, in addition, doing a man's work in the yard. She not only did the usual gardening but also assisted the decedent in doing heavy work in constructing retaining walls and rockeries. In addition, upon occasion she acted as hod carrier when he was laying brick.

As previously noted, the trial court found that these services were gratuitously rendered. In any event, they do not, in the absence of proof of a contractual agreement between the parties, afford a legal basis for appellant's claim to half of decedent's estate. This is not an action in quantum meruit. Even if it were, consideration would have to be given to the fact that appellant received board and lodging for 13 years under conditions that were apparently satisfactory to her. But this court has held that it will not order an accounting between the parties to a meretricious relationship. *West v. Knowles, infra.*

The trial court found that it was impossible to trace the source of the funds used to purchase the real property on which the house was constructed or of those used in the accumulation of the decedent's estate. This finding does not justify a presumption that the parties intended to divide equally, on the same basis as community property, the property acquired during their meretricious relationship.

In *West v. Knowles,* 50 Wn.2d 311, 311 P.2d 689 (1957), relied upon by appellant, we said:

> Neither party contends there was a business partnership between them. In meretricious relationship cases, the court will award the properties before it to the party determined to be the owner thereof. It will not go back to the beginning of the relationship and take an accounting of the earnings and disbursements as if a trust relationship existed.

The general rule applicable to this case is stated in an annotation in 31 A.L.R.2d at page 1277:

> The cases generally indicate that in the absence of an agreement to pool earnings, a partnership, a joint venture, or circumstances sufficient to establish a constructive trust, a woman or man cohabiting with each other with knowledge of the illegal nature of the relationship does not, by reason of such cohabitation alone, acquire any rights in the accumulations of the other during the period of such illegal relationship.

In support of her contention that respondent administrators hold a half interest in the home property in trust for her benefit, it is argued by appellant that to allow the entire property to go to the children of Mr. Humphries would result in the "unjust enrichment" of the children (or his estate). We are unable to find any case which adopts the constructive trust theory except where some action on the part of the deceased (or his heirs), which was inequitable in character, had prevented the claimant from having a legally sufficient claim, as differentiated from an equitable claim.

In order to have such an equitable claim, appellant must show that there has been some inequitable conduct

on the part of the decedent or his heirs or respondents. In the cases which we have examined on this subject, the inequitable conduct shown amounted to fraud, overreaching, breach of a fiduciary responsibility, breach of contract, or mistake. See cases cited in 11 Wash. Digest (part 1), Trusts §§ 91-111, especially *Bland v. Mentor*, 63 Wn.2d 150, 385 P.2d 727 (1963). None of these essential factors have been even alleged in the case before us.

In the *Bland* case, we held that clear, cogent, and convincing proof was essential to a finding of fraud or the imposition of constructive trust. In that case, we quoted the definition of a constructive trust found in an earlier case as follows:

In *Nicolai v. Desilets*, 185 Wash. 435, 436, 55 P.2d 604, we have defined a constructive trust as:

" . . . the device used in equity to compel those who unfairly hold a property interest which they obtained or retain by reason of unjust or unconscionable means to convey that interest to, or to hold it for, another to whom it justly belongs; or, as Mr. Justice Cardozo, in *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, said:

" 'A constructive trust is then the remedial device through which preference of self is made subordinate to loyalty to others.' "

We have held that fraud, misrepresentation, bad faith, or overreaching usually forms the base upon which a constructive trust is erected. *Rozell v. Vansyckle*, 11 Wash. 79, 39 Pac. 270; *Saunders v. Visser*, 20 Wn. (2d) 58, 145 P. (2d) 898; *Bangasser & Associates, Inc. v. Hedges*, 58 Wn. (2d) 514, 364 P. (2d) 237. And, a constructive trust may be established by parol evidence. *Kausky v. Kosten*, 27 Wn. (2d) 721, 179 P. (2d) 950.

The most that can be said of the conduct of Mr. Humphries prior to his death, which in any way supports appellant's claim of a constructive trust, is that he failed to provide for her *after* his death in the manner in which he had provided for her *before* his death. There is no basis for holding, under any theory, that he had any legal duty to provide for her either before or after his death. This court should not invent a legal concept or misapply a time-honored equitable

theory of constructive trust because of compassion over the woman's supposed predicament.

In this case, there was no evidence of fraud, misrepresentation, bad faith, or overreaching on the part of the decedent or his heirs. Appellant knew, on March 23, 1955, and at all times thereafter prior to decedent's death that the title to the home property was in his name and the reason why she was not included as a grantee in the deed. None of the above-enumerated elements necessary to support a constructive trust are present in this case. Not only is there no clear, cogent, and convincing evidence of any such misconduct on decedent's part, but there is not even a scintilla of evidence. The trial court's conclusion on this issue was:

> Any work done by Beatrice Tyler on property held in the name of Edward J. Humphries was done as a gratuity.

The trial court found (1) that there was no evidence that appellant contributed money to the acquisition or development of the home property, (2) that the decedent did not intend to convey the home property to, or create any ownership interest therein in, appellant, and (3) that the decedent and appellant were not partners or joint venturers in the acquisition or development of the home property.

Since these findings are supported by substantial evidence, the trial court's judgment is correct.

As the trial court pointed out in its oral decision, the decedent knew about the necessity of making a will[2] (if he

---

[2]Decedent's son, William Humphries, testified: ". . . Prior to Dad passing away I was constantly after him to make a will, which he was under the verge of doing several times, and his intentions were to take care of Bea, and as to what extent as far as money and property I am not real sure on, but I know he was real concerned about taking care of Honeybee."

Furthermore, in 1959, the decedent had a very serious stomach operation and was in the hospital for about two weeks. This event (plus his son's promptings) gave the decedent warning to put his affairs in order. Evidently, during the last 3 years of his life he was satisfied with the status of his property.

had wanted to provide for appellant), and he also knew how to transfer real property. Presumably, he could have married appellant at any time between August 11, 1949, and April 9, 1962 (the date of his death). He failed to do any of these things during the period of 13 years that they had lived together, and, in the absence of any evidence of contractual obligations, the decedent must be presumed to have intended to keep the real property for himself and have it pass to his six children upon his death under the statutes relating to inheritance of an intestate's property.

Within 3 years after having the stomach operation referred to in footnote 2, the decedent suffered a gastric attack and was taken to the hospital for another similar operation. Just prior to his going into surgery, his daughter-in-law talked to him in the presence of appellant and the decedent's son, William. Her testimony regarding this conversation is as follows:

A. Well, this was just prior to—probably two hours before he went to surgery, and he asked for an attorney and I told him he couldn't have an attorney at that time, and I told him not to worry about it, he was going to be all right, and he said to Bill, and I and Bea, he said, "I am sorry to have left you in this mess." And then he told Bill to take Shirley home and he said to take care of Honeybee, Shirley and the girls. Q. When he said Shirley and the girls, what girls did he mean, if you know? A. My four. Q. And then how long was it after that he went to surgery? A. He went up to surgery right after that. Q. Did you have any further conversation with him? A. Just out in the hall. Then he kissed me and I kissed him. I told him everything was—be all right. He said, "No. This is goodbye for me."

The decedent died shortly after this conversation.

As pointed out above, the decedent, who was experienced in business transactions relating to the purchase and sale of real property, did nothing for 13 years to convey any interest in the home property to appellant, nor did he execute a will which would have devised such an interest to appellant. In spite of his son's repeated urging that he make a will, the decedent did nothing about this problem until

about two hours before he was to go into surgery (from which he died) when he asked for an attorney. When no attorney was available, he said to appellant, his son, and his daughter-in-law that he was sorry to leave them "in this mess."

Under such circumstances as are disclosed by this record and the findings of the trial court, the courts cannot, by making contracts or wills for the decedent, legally accomplish a transfer of real property to appellant which the decedent deliberately failed to do during the last years of his life. He must, in view of the uncontroverted testimony of appellant's witnesses, have known that without his making a will his property would, upon his death, pass to his six children pursuant to the statutes relating to intestate succession.

In the interest of clarification, we wish to point out that, under the judgment of the trial court, appellant received all of the personal property located in the home which she claimed in her complaint, plus a one-half interest in the balance due on the Squier note (she claimed the entire balance).

In addition to these items, she received all of the balance in the savings account held by decedent and appellant in the amount of $1,380.85. This was a joint account with the right of survivorship.

Appellant's basic contention on this appeal is that the trial court erred in failing to award her a one-half interest of the balance of the estate of the decedent. The trial court found that appellant had failed to prove her claim as to any of the four alternative grounds for relief alleged in her complaint.

Since, in our opinion, appellant has not shown that there is merit in any of her assignments of error, we affirm the judgment of the trial court.

ROSELLINI, C. J., HILL, WEAVER, and OTT, JJ., concur.

FINLEY, J. (dissenting) — Plaintiff-appellant Beatrice Humphries brought this suit seeking to establish a one-half interest in the estate of Edward Humphries, deceased.

The principal asset of the estate is the home, valued at $42,-000, in which the couple lived at the time of Mr. Humphries' death.

The couple lived together for 13 years as man and wife, though in fact they were not legally married. Both Edward and Beatrice Humphries were quite amenable to this living arrangement, and, knowing the relationship to be meretricious, they held themselves out to the world as husband and wife. The adult children of each (by former marriages) knew of the relationship and, apparently, registered no disapproval. In fact, several are on record as to approval and have expressed the view that the arrangement was helpful to both parties. Edward and Beatrice Humphries, who apparently had deep feeling and regard for each other, contributed to the relationship to the full extent of their ability in and out of the home. Many specific instances are pointed to in the record on behalf of Beatrice Humphries which show the contribution of part-time earnings during the limited times when she worked outside the home, instances of helping Mr. Humphries, a retired bricklayer, in small week-end bricklaying or fireplace construction jobs, and extensive efforts in improving and landscaping the home in which they lived.

Perhaps it could be said that the financial contributions of the plaintiff were in general not unlike or significantly more extensive than those of the average non-employed wife in a legally consummated marriage. Much of her effort was expended in the home, keeping house, cooking and managing household affairs. In fact, the trial court found that there was no evidence that Beatrice Humphries had contributed any money to the acquisition or development of the home or other estate assets. However, the record shows that the efforts of the plaintiff had a very significant impact on the net worth of the decedent. When he met the plaintiff in the latter part of 1948, or early part of 1949, he owned a home valued at $4,000, and had approximately $50 in the bank. The plaintiff painted this house, inside and out, and redecorated it with wallpaper. It was sold in 1952 to the son of decedent for $6,000, but

the decedent and the plaintiff continued to live in it for another year. In 1954, another house was purchased for $3,400, and the title was taken in the name of Edward J. Humphries. Again the plaintiff repainted and wallpapered and renovated the house, which was appraised among the estate's assets at the value of $7,000.

In 1952, the decedent and the plaintiff decided to build a duplex on a steep lot overlooking Lake Washington in Seattle. They intended to sell the building upon its completion. In 1952, the decedent invested $16,500 in the building and land; and in 1955, he invested another $17,815.54. Again title was taken by the decedent, Edward J. Humphries. The plaintiff devoted constant efforts to converting the steep lot to a livable site. She helped her husband move rocks to construct a rockery 100 feet long and 7 to 8 feet high. She added 5 yards of "fill" to the front yard, doing most of the work during the absence of her husband. She also helped to move concrete slabs and poured concrete to make a retaining wall. The rockery and retaining walls alone involved a year of work. The plaintiff helped terrace the land with old tires, rocks, and concrete; she helped reconstruct the retaining wall after it washed out. When the sewer was installed, she moved dirt "just like a man." She did most of the painting, inside and out, and sanded and finished the cupboards and mahogany paneling. The building contained five brick fireplaces, and had a brick exterior except on the ends of the house. The plaintiff was a hod carrier for her "husband" while he constructed the fireplaces and the exterior walls. Although there is still more work to be done in the basement, the building is appraised presently at $42,000.

The trial court awarded the entire estate to the intestate heirs of Edward Humphries, after denying the claim of the plaintiff regarding the assets as to which legal title happened to be in the name of Edward Humphries at the time of his death. The plaintiff did receive certain personal items and house furnishings, and a one-half interest in a note wherein she and Edward Humphries were named as co-owners. The trial court apparently reasoned that any

assets acquired during the relationship as to which title was taken originally in the name of Edward Humphries were his separate property, apparently, at the precise instant the title was lodged in his name, irrespective of any other considerations. It was further reasoned that the assets thereafter remained the property of Mr. Humphries until and unless he, himself, had performed some universally recognized, or lesser but formalistic and orthodox, legal ritual or act reserved especially for effecting a change in the record title and ownership of real property. This, of course, ignores or refuses to accept and give effect to such orthodox and judicially recognized concepts as (a) constructive trusts, (b) joint ventures or quasi partnerships, (c) quasi contracts, and (d) implied contracts. And, of course, these concepts accord legal validity and effect to the conduct and acts of individuals not involving the formal execution of solemn written documents. In any event, the trial judge went on to say:

> You mean if this gentleman intended to give this lady the property, that is all it takes? I don't understand your statement that I have any right to make an equitable distribution. I have no rights at all as I see it. I merely declare what the property was at the time of acquisition or find that a transfer was made. I have no right to equitably distribute it.

The trial judge actually found that the major assets in the estate *were accumulated* and *the house was built during the period Beatrice and Edward Humphries lived together*. It was further *found that it was impossible to trace the source of the funds used to accumulate the estate*. Therefore, the rule under which the trial court purported to decide the case—*i.e.*, that the ownership of property is established at the exact time it is acquired—leaves unanswered the main and essential questions: Who acquired it? How, and with what funds, and from what sources? *As the source of the funds could not be traced*, and the plaintiff *produced evidence that she contributed her efforts toward the accumulation of the estate*, the determination that the plaintiff had no interest would seem to have been based upon a

*conclusive presumption* that, at least in the setting of an unmarried relationship, property is acquired and subsequently owned by the one in whose name, by happenstance or otherwise, legal title is originally taken. But we have held that such a *conclusive presumption* is to be indulged *only* in *the total absence of other contrariwise evidence.* I am convinced such a *conclusive presumption* was improperly applied in the present case. Whatever uncertainties may have existed in this area of the law following and related to the decision of this court in *Creasman v. Boyle*, 31 Wn.2d 345, 196 P.2d 835 (1948), were laid to rest in *Poole v. Schrichte*, 39 Wn.2d 558, 236 P.2d 1044 (1951), where we said:

> *to say that* we held in *Creasman v. Boyle, supra*, that, if a man and woman had lived together in a relationship known by both of them to be meretricious, *the courts will leave them in the position in which they placed themselves, and that it will be conclusively presumed that they intended to dispose of their property exactly as they did dispose of it, is to distort our holding* in that case *and to ignore* the words which we have italicized, *"in the absence of any evidence to the contrary."* (Italics mine.)

The significance of the location of legal title in the name of one or the other party should not be enhanced or depreciated simply because the two people are involved in a meretricious relationship. The absence of a legal and subsisting marriage simply results in the inapplicability of the community property law of this state. It should be obvious that Beatrice Humphries can predicate no rights specifically on community property principles of law. However, the ineligibility of the plaintiff for the benefits and safeguards of our community property system should not, through the creation of legal fictions exalted to the status of legal presumptions, deprive her of comparable, even identical, interests and rights afforded under other recognized and operative principles of our legal system. These are based upon somewhat different, but nevertheless approved and accepted, equity considerations, concepts and doctrine respecting the alienation of property, its owner-

ship and effective or enforceable title thereto. The illegal or perhaps immoral nature of the social relationship of Beatrice and Edward does not as a dreaded terminal disease infect, devitalize and destroy the legal claims or rights acquired or created during the relationship. The courts have the power, indeed I believe a clear duty, to consider and settle the questions set before them concerning the property rights of such persons. *Poole v. Schrichte, supra*; and see opinion concurring specially in *West v. Knowles*, 50 Wn.2d 311, 315, 311 P.2d 689 (1957). The "washing of hands" device seemed to have satisfied Pontius Pilate. However, the device was simply an effort to put responsibility aside. It failed then to meet and provide real solutions for the real problems of real people. The technique fails today.

In the present case the record shows that two people joined their efforts under an arrangement approximating in a definite sense a form of partnership. Although devoid of the requisite legal as well as religious formalities inherent in a marital relationship, the case of Beatrice and Edward may be a somewhat more frequent type of association or relationship between men and women than is generally admitted. The male partner was essentially the bread winner of the combination, about the same as in the case of most married couples; and his income-producing efforts took place outside of the home. The efforts of the female partner embraced those usually associated with the distaff side and were expended in the home. Thus, the contribution of each party to such an arrangement or partnership was by each one apparently treated or understood to be roughly equal in significance. Certainly this is the case and it can be said to be true where the arrangement is more orthodox in terms of form and involves marriage. In addition to mentioning the hard back-breaking kind of labor and work contributed by Beatrice Humphries, it can be said that had her efforts as the distaff member of the partnership not been expended in the homemaking chores, it would have been necessary for Mr. Humphries to employ someone and to expend some portion of his earnings to provide the housekeeping services. In *Knoll v. Knoll*,

104 Wash. 110, 176 Pac. 22, 11 A.L.R. 1391 (1918), such a relationship was treated as a partnership as to all property acquired by the joint efforts of the parties. In considering what comprises *joint efforts*, this court said:

In addition to this, the appellant performed all the duties of a housewife faithfully. So long as the parties lived together as husband and wife, both labored in their respective fields, and the property acquired during this time was the result of their joint efforts.

In the instant case the plaintiff has shown that the parties entered into an arrangement whereby an agreeable division of labor was made. Property was acquired and held during a substantial period of time when the woman expended efforts in the home and gave substantial and valuable help in making capital improvements respecting the property in question. The majority is indubitably willing to accept the difference in the contributions of the male and the female members of a marital relationship, partnership, or community, without substantial prejudicial effort upon the interests of the distaff member. But, a big distinction, which I think is an unrealistic, unwarranted and unnecessary one, is made and emphasized strongly by the majority relative to the unmarried partnership of the couple involved in the instant case. Glossed over completely is the fact that the contributions of the woman were not only equal *but much greater* in the instant case *than those in most marital community* situations. A prima facie case was made out which satisfied any burden placed on the plaintiff under *Creasman, supra.* The *Creasman*-like conclusive presumption was rebutted, placing some responsibility on the defendant to counter the prima facie case by a showing that both parties intended ownership to follow title. In other words, when a showing is made, as in the instant case, that two people worked together, lived together as husband and wife, behaved socially as husband and wife, and otherwise held themselves out as husband and wife, then the conclusive presumption of *Creasman* is of dubious applicability. The home property, or house, involved herein is, at least in a prima facie sense, a partner-

ship asset. This main partnership asset in the instant case certainly was used, and I daresay was held in a seemingly quasi-common ownership; and the party who claims by reason of paper title should be put to his proof to rebut the prima facie case by a showing that the parties intended ownership to coincide with the paper title.

As we said in *Creasman v. Boyle, supra,* when there is no evidence concerning the efforts and contributions of the parties, and there are no other facts from which an arrangement or agreement as to common ownership could be reasonably inferred, it is necessary to presume that legal title is rightfully where it stands. However, such a conclusive presumption is tentative at best and disappears with the introduction of evidence reasonably tending to establish a contrary intent of the parties. When the nature of the relationship is such as to lead a reasonable man to conclude that the parties intended to share in the property accumulated while they lived together, no conclusive legal presumption should dictate a contrary result.

The majority places much emphasis upon the nonexistence of a formal and explicit contract, partnership agreement, or other solemn legal document. But, risking repetition, it seems to me this completely overlooks concepts such as quasi contracts, implied contracts, constructive trusts, joint ventures, and others employed historically by the courts under equity considerations and principles to ameliorate the harshness of strictly legal doctrines and considerations. In support of the position taken the majority cites *Jennings v. D'Hooghe,* 25 Wn.2d 702, 172 P.2d 189 (1946), and *Bicknell v. Guenther,* 65 Wn.2d 749, 399 P.2d 598 (1965). But the error implicit in the unnecessarily harsh doctrinaire reasoning in these two decisions is not justification for the perpetuation of *comparable error* in the instant case. See and compare the comment re *Bicknell v. Guenther, supra,* in Washington Case Law, 40 Wash. L. Rev. 367.

Before concluding this opinion, perhaps mention should be made of the obvious, namely: The legislature has provided for the imposition of criminal sanctions respecting the conduct of parties to a meretricious relationship. Articu-

lated more dramatically, and more prejudicially stated, the legislature has made "illegal cohabitation" a crime; RCW 9.79.120 and RCW 9.92.020. But the legislature has not provided that the indicated conduct has broader implications affecting the right to acquire interests or title to property and to alienate and transfer such rights. From the action and inaction of the legislative branch, it does not follow logically and immutably that the judicial branch either should or must take the step that the legislature has not taken as a matter of imperative social policy. In other words, should the courts penalize more severely than the legislature the female partner or associate in the "unmarried" but long-standing and mutually agreeable and acceptable male-female relationship in the instant case? Should the civil side of the law castigate her as a "fallen woman" by strict Victorian standards and by the same standards arbitrarily deprive her of rights to acquire interests in and title to property, when friends, family and neighbors certainly have not been so inclined?

In my judgment the trial court should be reversed and the case remanded with directions for further proceedings respecting the right of the plaintiff to share in the estate commensurate with the intent of the parties and their contributions to the partnership inferred or implied from their conduct and activities over a period of 13 years. It has been noted hereinbefore that the defendant herein apparently relied exclusively on the conclusive presumption of *Creasman* that ownership as a matter of course follows paper title. However, under the facts and circumstances herein, this seems to me not enough to equate absolute legal ownership with mere paper title. Since the plaintiff has rebutted any *"Creasman-like"* conclusive presumption by presenting a prima facie case, the defendant has some burden of proving that the paper title reflects the intent of the parties. The defendant should be given the opportunity to present proof on remand to assure just disposition in this matter. If the defendant fails to do so, then the plaintiff's prima facie case, as such, should go to the trier of fact. In this light the fact of paper title will

be one element of proof; but it should not give rise to an iron clad conclusive presumption dictating and controlling decision and disposition respecting the property.

I would affirm the judgment awarding the plaintiff the one-half interest in the note upon which she was named as co-owner.

HAMILTON, J. (dissenting)—I would remand this case for the introduction of further evidence and the entry of further findings.

As pointed out by Judge Finley, this court has limited the import of *Creasman v. Boyle*, 31 Wn.2d 345, 196 P.2d 835 (1948), to a situation wherein there is *no evidence presented of an intent* that interests in property acquired by parties to a meretricious relationship shall be other than as indicated by the paper title. See *Walberg v. Mattson*, 38 Wn.2d 808, 232 P.2d 827 (1951); *Poole v. Schrichte*, 39 Wn.2d 558, 236 P.2d 1044 (1951); *Iredell v. Iredell*, 49 Wn.2d 627, 305 P.2d 805 (1957); *West v. Knowles*, 50 Wn.2d 311, 311 P.2d 689 (1957).

The basic rule, which has been inferentially accepted and applied in this state, can be paraphrased from 31 A.L.R.2d 1277-78, as follows: In the absence of evidence sufficient to reveal an agreement to pool earnings, a partnership, a joint venture, or a trust (resulting or constructive), a woman or man cohabiting with each other, with knowledge of the illegal nature of their relationship, does not, by reason of such cohabitation alone, acquire any property rights in the accumulations of the other during the period of such relationship. See *Engstrom v. Peterson*, 107 Wash. 523, 182 Pac. 623 (1919); *Hynes v. Hynes*, 28 Wn.2d 660, 184 P.2d 68 (1947); *Walberg v. Mattson, supra; Poole v. Schrichte, supra; Iredell v. Iredell, supra; West. v. Knowles, supra.*

In the instant case, the trial court in essence found and concluded, from the evidence presented, that (a) appellant and decedent were not, by any specific agreement between them, partners or joint venturers in the acquisition of the property in question, and (b) it was not possible to

trace the funds used to purchase the property. These findings and conclusions, if accepted as correct under the evidence, can be said, as the majority has said, to technically rule out appellant's theory of a specific division of the property.

However, I do not deem such findings and conclusions rule out a theory of either a constructive trust or an equitable lien.

A constructive trust has been classically defined by Mr. Justice Cardozo in *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386, 122 N.E. 378 (1919), as follows:

> A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.

The formula is often applied to prevent unjust enrichment. Restatement, Restitution § 160, p. 640, *et seq.* So, too, is the theory of equitable lien. Restatement, Restitution § 161, p. 650, *et seq.*

Had the evidence in the instant case revealed that appellant had furnished a specific amount of money, *i.e.*, $5,000 toward the improvement of the property in question, I daresay this court would have encountered no difficulty in imposing an equitable lien or trust against the property in such amount. The majority, however, seem unwilling to equate labor to money; hence, they attach no value or significance to the evidence bearing upon the physical work expended by appellant in enhancing the value of the property, except to infer that, in their opinion, she was amply rewarded therefor by board and room. That their opinion in this regard was not shared by the decedent seems amply demonstrated by the testimony of William Humphries (see footnote 2 in the majority opinion) and the statements of the decedent prior to his final operation.

Appellant's evidence without dispute indicates she expended far more labor and effort in the development of the property in issue than that which could, under any reasonable assumption, be deemed to have been given and

received as a gratuity or in return for board and lodging. This evidence, coupled with the evidence of decedent's expressed intentions, constitutes a sufficient showing to present the issue of the propriety of imposing an equitable lien or constructive trust to the extent of the reasonable value of work, and/or to the extent it can be said the work contributed to the enhanced value of the property. To deprive appellant of the fair value of her physical labor is to unjustly enrich decedent's heirs. Such a result, I am satisfied, was not intended by decedent. Neither does it appear that such a result is adamantly desired by the heirs.

Accordingly, it is my opinion that the trial court erred in concluding that appellant's "man's work" about the premises was furnished as a gratuity. I would, therefore, remand the case for the introduction of such further evidence as may be necessary to make findings upon (a) the reasonable value of the "man's work" performed by appellant upon the premises, and (b) the correlation thereof, if any, to the enhanced value of the home property. From these findings an equitable lien or constructive trust upon the home property could well follow.

HUNTER and HALE, JJ., concur with HAMILTON, J.

_____

March 9, 1966. Petition for rehearing denied.